THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT EARL, Appellant.

Second Department, December 29, 1975

*William E. Hellerstein* and *William J. Gallagher (Elliot Schnapp* of counsel), for appellant.

*Nicholas Ferraro, District Attorney (Annamarie Policriti* of counsel), for respondent.

MARTUSCELLO, J. Shortly after midnight on the morning of September 13, 1970, Patrolman Jesse Carter, an off-duty New York City Housing Authority policeman, was driving home from the movies with a female companion, when he observed the defendant and another "crouched" behind a parked automobile in a partially deserted parking lot in the South Jamaica section of Queens. Although his vision was partly obscured by the parked car, Carter stated that he could see the "whole upper part" of the defendant's body, and that the defendant was holding an object in his hands. He further stated that the defendant's companion was holding an object in his hands as well, which the latter thereafter placed in his rear pants pocket. The officer admitted candidly that he did not know what either object was at the time.

Continuing around the corner, Carter entered the lot, turned off his lights, and parked in a parking space two car lengths away. He then paused for a "brief moment", turned on his headlights, and drove towards the two men. Halting the car, he exited briskly, identified himself as a police officer, and ordered the defendant to "freeze". The foregoing was accomplished with his pistol already drawn. As the defendant rose up from his crouched position, Carter observed him drop something to the ground, which Carter later retrieved and found to be a loaded handgun. The defendant was thereafter informed that he was under arrest and was searched. Six additional bullets were found in that search; a search of the companion revealed a second handgun.

A motion to suppress the physical evidence was denied by the Criminal Term, whereupon the defendant elected to plead guilty. He now seeks a reversal of his conviction, alleging, as the sole ground therefor, that the evidence was unlawfully obtained by reason of an illegal seizure. This contention cannot be sustained.

In light of the recent holding of our Court of Appeals in *People v Cantor* (36 NY2d 106), it can no longer be seriously contended that the defendant's gunpoint detention was anything less than a "seizure" within the meaning of the Fourth Amendment, as he was unquestionably, from that moment

forward, significantly deprived of his freedom of movement as a direct result of official police action *(People v Cantor, supra,* p 111; see, also, *Terry v Ohio,* 392 US 1). This being the case, it follows *ex necessitate* that the legality of the seizure, and perforce the admissibility of the evidence derived therefrom, must depend ultimately upon the presence of probable cause for the detention, or, in the alternative, "whether it fits within the narrow exception carved out by the Supreme Court in *Terry v. Ohio* (392 U. S. 1) and *Adams v. Williams* (407 U. S. 143) where forcible street encounters were found to have been properly initiated by the police and reasonable under the circumstances" *(People v Cantor, supra,* p 110). Here, as in *People v Cantor,* reliance upon probable cause has been disclaimed; hence the question presented is whether, under the facts of this case, the conduct of the police was otherwise "justified at its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible. *(Terry v. Ohio, supra,* at p. 19; *Cupp v. Murphy,* 412 U. S. 291; *People v. Kuhn,* 33 N Y 2d 203.)" *(People v Cantor, supra,* p 111). This, in turn, requires us to weigh carefully "the government's interest in the detection and apprehension of criminals against the encroachment involved with respect to an individual's right to privacy and personal security *(Terry v. Ohio, supra; Camara v. Municipal Ct.,* 387 U. S. 523)" *(People v Cantor, supra,* p 111; see, also, *United States v Ward,* 488 F2d 162, 168). We now embark upon this task, eschewing, as per the cautionary language of the Court of Appeals, the semantic trap of attempting to label the particular police action. "The proscription against unreasonable searches and seizures is designed to prevent random, unjustified interference with private citizens whether it is denominated an arrest, investigatory detention, or field interrogation *(Davis v. Mississippi,* 394 U. S. 721; *Cupp v. Murphy,* 412 U. S. 291, *supra;* see, generally, La Fave, Arrest: The Decision to Take a Suspect into Custody; Reich, Police Questioning of Law Abiding Citizens, 75 Yale L. J. 1161). * * * Whenever a street encounter amounts to a seizure it must pass constitutional muster" *(People v Cantor, supra,* p 112).

Discounting the existence of probable cause, the authority of the police in New York to intercept persons on the public street is derived from two independent sources: the so-called stop and frisk law (CPL 140.50) and the common-law right of inquiry (see *People v Rivera,* 14 NY2d 441, cert den 379 US

978). Pursuant to statute, in order for a person to be lawfully detained in a public place, it is necessary that the detaining officer harbor a "reasonable suspicion" that such person is committing, has committed, or is about to commit a crime, and, when used in this context, "reasonable suspicion" has been defined as that quantum of knowledge which, under the circumstances then present, would prompt an ordinarily prudent and cautious man to believe that criminal activity is at hand *(People v Cantor, supra,* pp 112–113). Vague or unparticularized hunches will not suffice for this purpose; nor will good will on the part of the police (see *Terry v Ohio, supra).* What is required, according to recent decisions, are "specific and articulable facts which, along with any logical deductions [therefrom], reasonably [prompt the given] * * * intrusion" *(People v Cantor, supra,* p 113).

By way of contrast, the common-law right of inquiry is not so strictly proscribed; it operates to permit lawful detentive inquiry upon grounds less compelling than "reasonable suspicion" (see *People v Rosemond,* 26 NY2d 101, 104). As was stated by the Court of Appeals in *People v Rivera* (14 NY2d 441, 444–445, cert den 379 US 978, *supra):* "The business of the police is to prevent crime if they can. Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime function of city police to be alert to things going wrong in the streets; if they were to be denied the right of such summary inquiry, a normal power and a necessary duty would be closed off" (see, also, *People v Peters,* 18 NY2d 238, 242–243, affd *sub nom Sibron v New York,* 392 US 40). Nevertheless, it is still clear that such authority cannot operate as a license to violate the Constitution; the common-law right of inquiry does not include the right to unlawfully seize. To quote again from *People v Cantor (supra,* p 114): "The minimum requirement for a lawful detentive stop is a founded suspicion that criminal activity is afoot (e.g., *United States v. Ward,* 488 F. 2d 162; *United States v. Bugarin-Casas,* 484 F. 2d 853, cert. den. 414 U. S. 1136). Our court has consistently limited this power when it has been exercised solely on the basis of vague suspicion or as a means of harassment (see, e.g., *People v. Stokes,* 32 N Y 2d 202; *People v. Schanbarger,* 24 N Y 2d 288; *Sibron v. New York,* 392 U. S. 40)" (accord *People v Buffolino,* 48 AD2d 904).

Applying the foregoing considerations to the case at bar, we

are of the opinion that Patrolman Carter's actions were, at the minimum, justified under the common-law right of inquiry; he was clearly possessed of such information as would warrant a "founded suspicion" that criminal activity was "afoot". Thus, Carter was aware, by reason of his observation, of the presence of two unidentified men "crouched" behind a parked car in a practically deserted parking lot in the South Jamaica section of Queens, and of the presence of "objects" in their hands. The hour was late, approximately 12:25 A.M. Although admittedly equivocal, and hence capable of innocent interpretation, the foregoing is precisely the sort of suspicious street conduct which should be investigated. In the absence of such investigation the cause of crime prevention may needlessly suffer (see *People v Rivera, supra)*. Plainly, we are not here dealing with that type of "random" or "unjustified" interference which was condemned in *People v Cantor (supra)*; nor are we dealing with a case of "vague suspicion" on the part of the police. What we have here is a situation wherein an officer, by reason of the hour, the location and the nature of the activity observed, came to harbor a "founded suspicion" that criminal activity was afoot, and acted reasonably to test that suspicion. While it may have been otherwise, given other details, the fact remains that under the circumstances of this case, the "seizure" was reasonable within the meaning of the Fourth Amendment; the government's interest in the prompt investigation of this caliber of unusual street conduct (and the consequent potential for the prevention of crime) must be held to take precedence over the undoubted (and initially temporary) encroachment of individual rights of privacy and personal security which necessarily results (see *People v Cantor, supra,* p 111).

We cannot, as the dissent has attempted to do, demean the quality of Carter's suspicion; nor do we fault his decision in drawing his gun. The facts observed were not, as has been suggested, equally consistent with changing a flat tire. The record fails to reveal those normal incidents of everyday life which we have come to associate with changing a tire (i.e., the raised or lopsided car, the bumper-jack, and the upraised trunk lid). Moreover, we would be loathe to hold that, in the absence of specific knowledge as to what objects the defendant and his companion were holding in their hands, a "founded suspicion" that criminal activity was "afoot" could not have arisen (see *United States v Bugarin-Casas,* 484 F2d 853), or

that by drawing his weapon, this officer converted an otherwise lawful detention into an illegal arrest (see *People v Wiggins* [decided herewith]). The element of danger in such circumstances is well documented by the cases (see *Adams v Williams,* 407 US 143, 146; *Terry v Ohio,* 392 US 1, 24, *supra; People v Rivera,* 14 NY2d 441, 446, cert den 379 US 978, *supra;* cf. CPL 140.50) and constitutes a factor which we can ill ignore. Thus, we are impelled to state clearly and for the record that the right of inquiry must be accompanied by a co-ordinate right to act reasonably to protect the officer and the public at large, and that, under the facts of this case, Carter's response to the situation was both reasonable and necessary to his personal well-being. Clearly, a lesser response by him may have rendered his own life forfeit. We do not believe that the Fourth Amendment's proscription against unreasonable searches and seizures requires officers in Carter's stead to risk their lives needlessly in the performance of their duty. Constitutionalism, at least in this context, does not require the sacrifice of natural rights.

SHAPIRO, J. (dissenting). After the defendant's suppression motion was denied, he pleaded guilty to the crime of possession of weapons and dangerous instruments and appliances as a misdemeanor. This appeal involves an aspect of the agonizing problem which often troubles the courts, to wit, whether to allow a defendant whose guilt is clear to go unwhipped of justice because the arresting officer has breached his constitutionally protected rights against unreasonable searches and seizures.

### THE FACTS

The defendant was arrested soon after midnight on September 13, 1970 by Jesse Carter, an off-duty New York City Housing Authority patrolman, who was in his private automobile and on his way home from the movies with a woman companion. As he was driving by an unfenced parking lot in Queens, he saw the defendant and another man, some 15 or 20 feet away, crouched behind an automobile parked in the partly deserted lot. Other cars were also parked in the lot. Although the car behind which the defendant and his companion were crouched was between them and Patrolman Carter, the officer could see the whole upper part of the defendant's body. Patrolman Carter testified that the defendant "had his hands up" and that he saw an object in his hands *but could*

*not see what it was.* He also testified that he also saw the defendant's companion place an object into his rear pants pocket, but he did not know what that object was. Patrolman Carter then pulled his car into the parking lot, turned off his lights, and parked it almost two car lengths away from the defendant and his companion. He then turned on his car headlights, drove his car right up to the defendant, stopped his car, and got out, facing the defendant. He had his pistol in his hand and said "freeze, police officer", and told the defendant to place his hands on his, Carter's, car. He testified that when he did this he still did not know what the object was that he had seen in the defendant's hand. He then testified that he thereafter saw the defendant drop the object in his hand to the ground. When he retrieved it, Patrolman Carter found it to be a loaded gun. He then searched the defendant and found six additional bullets in his pocket.

### THE DECISION UNDER REVIEW

The Criminal Term, in denying the defendant's suppression motion, ruled that Patrolman Carter was properly investigating the suspicious activities of the defendant and his companion when he approached them and identified himself to them as a police officer. It went on to say that, as he did so, the defendant dropped an object to the ground at his feet and that when Patrolman Carter picked it up he found it to be a loaded gun, as a result of which he arrested the defendant. The Criminal Term therefore found that the arrest of the defendant was proper and that, consequently, the ensuing search, which disclosed six more rounds of ammunition in the defendant's pocket, was also proper.

### THE LAW

If the facts were as the Criminal Term stated them, that Patrolman Carter arrested the defendant only *after* he found that the object he had seen in the defendant's hand was, in fact, a gun, the correctness of its denial of the motion to suppress would be beyond question. However, Patrolman Carter's testimony was that when he turned on his headlights and limned the defendant in them and got out of his car, his gun in hand, and told the defendant, "freeze, police officer", he did so without knowledge that either the defendant or his companion were armed and that his only ground for thus proceeding was that he had seen them crouching behind a parked car,

the defendant with an unknown object in his hand. Clearly, therefore, at the moment that Patrolman Carter pointed his gun at the defendant and ordered him to "freeze", the latter was being "physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action" and he had therefore been "seized within the meaning of the Fourth Amendment" *(People v Cantor,* 36 NY2d 106, 111). As the Court of Appeals there said (p 111): "This is true whether a person submits to the authority of the badge or whether he succumbs to force." Clearly, because of the police officer's gun, the defendant was then "deprived of his freedom of movement" (p 111) and was under arrest at that very moment, a moment when the police officer as yet had no probable cause to believe that a crime was being committed.

In *People v Cantor,* the court said (pp 112–113): "Before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime (CPL 140.50). Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand. (Compare Schwartz, Stop and Frisk: A Case Study in Judicial Control of the Police, 58 J. Crim. L.C. & P.S. 433, 445 with La Fave, 'Street Encounters' and the Constitution: Terry, Sibron, Peters and Beyond, 67 Mich. L. Rev. 40, 70.) To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice *(Terry v. Ohio,* 392 U. S. 1, *supra; Wong Sun v. United States,* 371 U. S. 471, 479). Nor will good faith on the part of the police be enough to validate an illegal interference with an individual (e.g., *Terry v. Ohio, supra; Henry v. United States,* 361 U. S. 98, *supra; Hill v. California,* 401 U. S. 797; *Smith v. County of Nassau,* 34 N Y 2d 18)."

Here, "the record is barren of any objective evidence evincing criminal activity" *(People v Cantor, supra,* p 113), for, at the time Carter arrested the defendant at gunpoint, he had no knowledge that the defendant's behavior was "dangerous to the safety of the police or others *(Warden v. Hayden,* 387 U. S. 294)" *(People v Cantor, supra,* p 113). The officer frankly conceded that at the time when, gun in hand, he ordered the defendant to "freeze", he had no notion what the object in the

defendant's hand was; nor did he know that it was a gun until he saw it at the defendant's feet.

In *Cantor* the court also said (pp 113–114): "Turning to the common-law authority of the police to make investigative inquiries, we note that this authority does not give the police a license to violate the Constitution (cf. *People v. Rivera,* 14 N Y 2d 441, 448 [FULD, Ch. J., dissenting]). The common-law power to inquire does not include the right to unlawfully seize. The minimum requirement for a lawful detentive stop is a founded suspicion that criminal activity is afoot (e.g., *United States v. Ward,* 488 F. 2d 162; *United States v. Bugarin-Casas,* 484 F. 2d 853, cert. den. 414 U. S. 1136). Our court has consistently limited this power when it has been exercised solely on the basis of vague suspicion or as a means of harassment (see, e.g., *People v. Stokes,* 32 N Y 2d 202; *People v. Schanbarger,* 24 N Y 2d 288; *Sibron v. New York,* 392 U. S. 40)."

Here, Patrolman Carter's testimony was that he saw the defendant and another man crouching behind a car and that the defendant had an object in his hand. Beyond that fact, Patrolman Carter had no ground for suspicion. The object might have been a tire iron for fixing a flat tire. By itself it was no basis for "a founded suspicion that criminal activity" was "afoot". *The defendant and his companion took no evasive action when Patrolman Carter's car entered the lot and parked near them.* In brief, Patrolman Carter had neither probable cause nor a founded suspicion of criminal activity afoot when he seized the defendant. Therefore, the motion to suppress should have been granted. I reach this conclusion with a great deal of reluctance since I am not unaware that cases such as the instant one raise serious problems for the courts, and even more serious ones for the police officers involved. Here, subsequent events demonstrated beyond the slightest doubt the correctness of the arresting officer's course of conduct. Had he failed to have his gun drawn and to order the defendant to "freeze", he might well have been a victim of the guns of his armed arrestees. However, constitutionally protected Fourth Amendment rights cannot be dispensed with solely because the results of an unreasonable search and seizure, made without probable cause, demonstrate that the person whose constitutional rights have been infringed was in fact armed with illegal weapons. The fact that the subject of the improper search and seizure, the defendant, was in fact

armed with a loaded weapon, and had extra ammunition for the weapon in his pocket, cannot serve to validate either his arrest without probable cause or the subsequent search of his person. While it goes against the grain to say to the arresting officer, whose life may well have been at stake, especially if he had failed to take the precaution of having his gun in hand when he ordered the defendant to freeze, that the fact that he acted on bald suspicion without sufficient prior evidence of the defendant's wrongdoing to constitute probable cause makes it necessary to suppress the product of the seizure and search, I must so vote. To do otherwise would be to fail to carry out my duty to support and defend the Constitution.

I am cognizant of the fact that both the highest court of our State and the Supreme Court of the United States have applied to police officers a somewhat different standard than that applied to ordinary citizens in determining what constitutes probable cause to sustain an arrest. In *Brinegar v United States* (338 US 160, 175–176), Justice RUTLEDGE said:

"Since Marshall's time * * * it [probable cause] has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v. United States,* 267 U. S. 132, 162.

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."
In *People v Valentine* (17 NY2d 128), the court declared that the standard of probable cause, as it applies to police, is that which would be probable cause to a reasonable, cautious, prudent police officer.

Applying that statement here, I find that the arresting officer, based upon his own testimony, did not have, at any time prior to his arrest of the defendant, reasonable ground to believe that the defendant or his companion was armed or that they were otherwise engaged in any criminal activity. For all he knew, they may have been engaging in perfectly proper activity. He had no grounds for believing "criminal activity" was "at hand" *(People v Cantor,* 36 NY2d 106, 113, *supra).* He did not "indicate specific and articulable facts which, along with any logical deductions, reasonably prompted" his intrusion on the defendant in a public place (p 113). The fact that his hunch as to the defendant turned out to be right cannot serve to establish the necessary probable cause, although it did turn out to have secured his safety (see *Sibron v New York,* 392 US 40, 63; *Henry v United States,* 361 US 98, 103; *Johnson v United States,* 333 US 10, 16–17). The law has not yet reached the stage where the proof of the pudding is in the eating.

As a court of law, we are bound to safeguard constitutionally protected rights against invasion when a police officer proceeds on no more than a "vague suspicion", even though the object of that invasion is a most despicable character. Our claim to uniqueness among the Nations of the world is our deep commitment to constitutionalism which, in a case such as this, requires a recognition of and respect for individual rights and liberties. We may not traduce our principles because their observance results, in an individual case, in freeing a guilty defendant (cf. *People v Sanchez,* 38 NY2d 72).

RABIN, Acting P. J., HOPKINS and CHRIST, JJ., concur with MARTUSCELLO, J.; SHAPIRO, J., dissents and votes to reverse the judgment, grant the motion to suppress evidence, and dismiss the indictment, with an opinion.

Judgment of the Supreme Court, Queens County, rendered October 9, 1974, affirmed.