No. 76–6695.  JACKSON v. UNITED STATES.  C. A. 3d Cir. Certiorari denied.

No. 76–6699.  BONNER v. WARDEN, STATEVILLE CORRECTIONAL CENTER.  C. A. 7th Cir.  Certiorari denied.

No. 76–1116.  NEW YORK v. EARL.  Ct. App. N. Y.  Certiorari denied.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST join, dissenting.

Shortly after midnight on September 13, 1970, Jessee Carter, an off-duty New York City police officer, was driving through the South Jamaica section of Queens on his way home from a movie.  His suspicion was aroused when he observed two individuals, later identified as respondent and a companion, "crouched" behind a parked automobile in a partially deserted, unfenced hotel parking lot.  The two were approximately 15 to 20 feet from Carter, and he noted that respondent was holding an object in his upraised hand.  Respondent's companion was also holding an object, which Carter saw him

place in his rear trouser pocket. Carter was unable to identify either of these objects.

The officer then drove his automobile onto the parking lot, stopping approximately two car lengths from the suspects. He turned off his headlights and observed them briefly. He then turned his lights back on and drove his car toward the men. He jumped from the car with his badge in one hand and his drawn revolver in the other, and shouted "Freeze—police officer."

Respondent rose from his crouched position, and Carter saw him drop the object he had been holding which turned out to be a fully loaded .38-caliber revolver. Officer Carter immediately placed the men under arrest, and proceeded to search them. He found six .38-caliber bullets in respondent's pocket and a loaded revolver in the pocket of his companion. Respondent was charged with possession of weapons and dangerous instruments and appliances. His motion to suppress the handgun as evidence was denied by the New York Supreme Court Criminal Term. Respondent then pled guilty to the charge, and, as permitted by New York law,[1] he appealed his conviction, charging that the motion to suppress should have been granted.

The Supreme Court Appellate Division affirmed respondent's conviction in an opinion joined by four justices. One justice dissented. The court first determined that Officer Carter "was clearly possessed of such information as would warrant a 'founded suspicion' that criminal activity was 'afoot.'" 50 App. Div. 2d 289, 293, 377 N. Y. S. 2d 649, 653 (1975). He was therefore held entitled to make further inquiry and to take such precautions as reasonably necessary for his safety. The court further held that Officer Carter's action exhibiting his badge and gun and asserting his authority was reasonable under the circumstances. Accordingly, it concluded that respondent's handgun was properly seized and

---

[1] See generally *Lefkowitz* v. *Newsome*, 420 U. S. 283 (1975).

that the trial court had correctly denied respondent's motion to suppress.

The New York Court of Appeals reversed the conviction, with two judges dissenting. 40 N. Y. 2d 941, 358 N. E. 2d 1037 (1976). In a brief unsigned order it adopted the opinion of the dissenting member of the Appellate Division.[2] The State filed a timely petition for writ of certiorari, seeking review of the Court of Appeals' decision.

In *Terry* v. *Ohio*, 392 U. S. 1 (1968), in an opinion by Mr. Chief Justice Warren, the Court recognized that a police officer has limited authority to make investigatory stops of individuals engaged in suspicious behavior which does not rise to the level of probable cause to make an arrest.[3] *Id.*, at 22. The *Terry* Court further held that, in conducting the investigation, the officer could properly take whatever action was reasonably necessary to assure his safety and the safety of others. The propriety of such police conduct—"necessarily swift action predicated upon the on-the-spot observations of the officer"—is not to be tested by a rigid probable-cause standard, but rather by the "Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.*, at 20 (footnote omitted).

*Terry* establishes a two-pronged test for determining the propriety of this type of conduct: "[1] whether the officer's action was justified at its inception, and [2] whether it was reasonably related in scope to the circumstances which justi-

---

[2] References to the New York Court of Appeals' opinion will therefore be understood to refer to the dissenting opinion in the Appellate Division. The New York Court of Appeals' final action was clearly based on federal constitutional law, not state law.

[3] This rationale was further elaborated in *Adams* v. *Williams,* 407 U. S. 143, 145 (1972), where we stated:

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."

fied the interference in the first place." *Ibid.* Under the first prong of the *Terry* analysis, it is clear that Officer Carter possessed sufficient facts "to conclude in light of his experience that criminal activity may be afoot." *Id.*, at 30. When the officer observed two individuals in a semideserted hotel parking lot "crouching" behind an automobile holding objects which could well have been weapons, he would have been grossly derelict in his duty to ignore what he saw.[4] In that setting—New York City at midnight—it would have been irrational for a police officer to fail to make further inquiry since the conduct of the two men gave rise to a reasonable suspicion that they might be involved in illegal activity.[5] The closeup observation by the officer neither confirmed his suspicions nor removed them. In light of these "specific and articulable facts," *id.*, at 21, and "the specific reasonable inferences which [Officer Carter was] entitled to draw from the facts in light of his experience," *id.*, at 27, it was entirely proper to conduct an investigatory stop to determine whether criminal activity was afoot. As Mr. Chief Justice Warren observed as to an analogous "suspicious" situation in *Terry:* "It would have been poor police work indeed . . . to have failed to investigate [respondent's] behavior further." *Id.*, at 23.

---

[4] As stated by MR. JUSTICE STEWART, "[a] policeman has a duty to investigate suspicious circumstances, and the circumstance of a person wandering the streets late at night without apparent lawful business may often present the occasion for police inquiry." *Palmer* v. *City of Euclid,* 402 U. S. 544, 546 (1971) (concurring).

[5] The opinion of the New York court suggests that respondent might have been holding a tire iron and was crouched behind the automobile because he was in the process of changing a "flat." However, as the Appellate Division majority pointed out, "[t]he record fails to reveal those normal incidents of everyday life which we have come to associate with changing a tire (i. e., the raised or lopsided car, the bumper-jack, and the upraised trunk lid)." 50 App. Div. 2d 289, 293, 377 N. Y. S. 2d 649, 654 (1975).

Once the officer approached the suspects for investigatory purposes, there came into play "the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Ibid.;* see *Adams* v. *Williams,* 407 U. S. 143, 146 (1972). The *Terry* opinion stated:

> "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 392 U. S., at 24.

The defensive measure sanctioned in *Terry* was a pat-down "frisk" of the suspect, *i. e.,* a detailed manual exterior probe of the subject's clothing and body, to assure that a weapon was not being concealed and to remove any weapon found. Mr. Chief Justice Warren's opinion for the Court acknowledged this was "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment," *id.,* at 17. Nevertheless, the Court held this to be a reasonable response to the danger inherent in a face-to-face encounter with a potentially armed and dangerous individual in the narrowly defined circumstances postulated in *Terry. Id.,* at 27.[6]

Of course, Officer Carter's conduct in this case was "intrusive." An individual confronted in the middle of the

---

[6] The Court stated in *Terry:*

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U. S., at 27. That test is amply met in the case before us.

night by a police officer holding a handgun and ordering him to "freeze" suffers an affront to his liberty and dignity—interests protected by the Fourth Amendment. But this is precisely what the Court balanced in *Terry*. The intrusion here was plainly within the contemplation of *Terry* and was justified by the circumstances confronting Officer Carter. Traveling in his private car, not equipped with a radio phone, he faced two possibly armed persons in a deserted parking lot, in the middle of the night. Under these circumstances it would have been foolhardy for Officer Carter to act less decisively than he did.

The holding of the New York Court of Appeals puts an officer of the law in Carter's position to a difficult choice indeed. He must either ignore what he sees and what his training and experience tell him he should investigate, thereby permitting the possible completion of criminal conduct for which the suspects may be preparing, or he may approach the suspect without preparing for the very danger which materialized here, thereby risking his life.[7] The holding of the Court in *Terry* introduced a long overdue element of common sense and rationality into this area of the law; it ought to be followed here. Surely, the Constitution does not require police officers to make the unhappy choice between dereliction of duty and risk of death. With the dissent of the New York Court of Appeals, I "do not believe that the Fourth Amendment's proscription against unreasonable searches and seizures requires officers in Carter's stead to risk their lives

---

[7] Respondent suggests that "[o]f course, Officer Carter, like any other citizen, would have had the right to satisfy his curiosity by addressing questions to defendant." Brief in Opposition 6. Of course, no citizen or policeman in his right mind would have approached respondent and his companion as he would a tourist in Times Square at high noon merely to satisfy idle curiosity. Officer Carter, unlike ordinary citizens, had a sworn duty to investigate such suspicious behavior, and was acting pursuant to such duty when he approached the suspects. His conduct should be commended, not reproached.

needlessly in the performance of their duty." 50 App. Div. 2d, at 294, 377 N. Y. S. 2d, at 654.

This Court cannot, of course, give plenary consideration to every erroneous holding, and I have no doubt that limitations of time and a crowded docket weigh heavily in the decision denying review. In my view, however, where the departure from prior law is as clear as in the instant case, and where the issue is so squarely presented by the petition for certiorari and the response, the matter could be easily resolved in a summary fashion, without the necessity for lengthy briefing and oral argument. See, *e. g.*, *United States* v. *Morrison*, 429 U. S. 1 (1976). I would therefore grant the petition for certiorari, and reverse the judgment because on the face of the record the Court of Appeals has clearly failed to follow the holding in *Terry* and other relevant cases.