■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD A. Ross, Appellant—Appeal by defendant from a judgment of the County Court, Nassau County, rendered June 16, 1977, convicting him of robbery in the second degree, upon a guilty plea, and imposing sentence. The appeal

also brings up for review the denial, after a hearing, of defendant's motion to suppress certain physical evidence and inculpatory statements. Judgment reversed, on the law and the facts, motion granted, indictment dismissed, and case remitted to the County Court, Nassau County, for the purpose of entering an order in its discretion pursuant to CPL 160.50. The issue raised is whether the County Court erred in failing to suppress certain physical evidence and inculpatory statements, in that the initial seizure of the defendant's person was allegedly illegal and thus tainted all evidentiary fruits derived therefrom (see, e.g., *Brown v Illinois*, 422 US 590). The minutes of the search and seizure *Huntley* hearing reveal the following facts: On March 2, 1977 Police Officer Pettas and his partner, Officer Conroy, were dressed casually, out of uniform, and were patrolling the Inwood area of Nassau County in an unmarked Camaro, as part of the Nassau County Narcotics Bureau detail. At about 2:00 P.M. both officers observed two male Blacks "running at a rapid pace" through a vacant lot. The two males crossed the boulevard in front of the police vehicle. According to the police, as they ran, they kept "looking behind them." Although the officers were aware that two muggings had occurred in the immediate area within the past three days (one on the previous day, March 1, and one on February 27), the police had no description of the assailants except that they were two male Blacks, approximately 18 to 20 years old. Upon observing the defendant and his companion running across the lot glancing behind them, Officer Pettas began to follow them with his vehicle. Pulling up to them, Officer Conroy jumped out of the vehicle, identified himself as a police officer, and physically "grabbed" hold of defendant Ross' arm to insure that he would physically stop. Despite the command to stop, the defendant's companion continued to run, eluding an attempt to apprehend him by Officer Conroy. Confronting defendant Ross, Officer Pettas immediately observed $7 in United States currency clutched in his left hand, as well as a blank job application. The officer demanded identification, but Ross could produce none and gave equivocal answers at first, as to his name. Ross told the officers that "he was coming from a job interview, or at least applying for a job" and that his mother had given him the money. A computer check on Richard Ross failed to indicate any outstanding warrant. At this point, the police put defendant into the police vehicle for the purpose of driving around the neighborhood "to see if [they] could find a crime victim" and, also, to check the address and telephone number Ross had given them. After about 10 to 15 minutes of driving, Officer Pettas stopped at the town park to verify the telephone number. At the point that Officer Pettas did indeed ascertain that Ross was who he claimed to be, Officer Conroy received a radio notification of a mugging by two male Blacks, approximately 18 to 20 years old, in the immediate vicinity of the location where they spotted Ross, and which netted the muggers some $7 in currency. At this point, it was the opinion of the police that they had probable cause to believe that Ross, together with the man who fled, had committed the crime and Ross was formally arrested. The elapsed time that defendant was in the police vehicle before receipt of official notification of the mugging was shown to be some 21 minutes by the certified transcript of the radio notification system. Subsequently, Ross made a written confession to the mugging. That confession, as well as the physical evidence, was sought to be suppressed by the defendant on the ground that the initial street encounter was an unconstitutional seizure of his person, thus tainting all subsequent evidence. The County Court denied the motion, essentially concluding that the initial street encounter in which Ross was physically

"grabbed" was a mere stop to inquire of Ross' identification, and which was entirely permissible based on "the initial observation of the defendant and his companion running while looking over their shoulders, coupled with the knowledge of two recent muggings in the immediate area by two young black males". The court added that the "limited" detention for 21 minutes in the police vehicle was reasonable and justifiable once Ross' companion fled the scene, together with "the immediate equivocal response of the defendant concerning his name and the observation of the money in hand". We disagree with the County Court and hold that, upon this record, the initial street encounter constituted a seizure of defendant's person which was impermissible as the officers lacked knowledge sufficient to sustain the intrusion. Consequently, all fruits derived therefrom must be suppressed as a matter of constitutional law. It is a fixed principle of criminal law that the police have the right to "stop and inquire" of persons on a public street when it appears that such persons are engaged in suspicious and/or unusual activity, for the purpose of ascertaining their conduct or confirming their identification. This is *provided,* however, that the police officer can focus upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion" *(Terry v Ohio,* 392 US 1, 21; accord *Matter of Kwok T.,* 43 NY2d 213, 218; *People v Sobotker,* 43 NY2d 559; *People v De Bour,* 40 NY2d 210, 215-217; CPL 140.50). However, the " 'common-law power to inquire does not include the right to unlawfully seize' " the individual *(People v Sobotker, supra,* p 563, citing, *inter alia, People v Cantor,* 36 NY2d 106, 114). That is to say, when the police have seized a person by physical constraint, more than good faith suspicion is necessary to sustain the greater intrusion, bordering on veritable probable cause *(People v Sobotker, supra; People v De Bour, supra,* p 217; *People v Earl,* 40 NY2d 941, revg 50 AD2d 289, on dissenting opn of Shapiro, J., at App Div, cert den 431 US 943). The "index by which we define whether the encounter is a mere 'stop' or a forcible 'seizure' is the aggressiveness of the police conduct" *(People v Figueroa,* 58 AD2d 655, 656) and the degree to which the individual's physical liberty of movement is constrained (see *People v Jennings,* 45 NY2d 998; *People v De Bour, supra; People v Cantor, supra,* p 111). In the case at bar, there can be no doubt that in physically "grabbing" the defendant, the police engaged in a forcible seizure of his person. This relatively aggressive act, completely halting him, constituted a "significant interruption with [the defendant's] liberty of movement" *(People v De Bour, supra,* p 216). Examination of the informational predicate upon which the police acted, however, fails to demonstrate the requisite quantum of knowledge necessary to justify this intrusion. The police were confronted with little more than two male Blacks running across a vacant lot, looking behind them as they ran. The police were neither aware of nor investigating any *specific* crime which had occurred *immediately* before and for which the two men could have been considered suspects (cf. *People v Figueroa, supra).* With respect to the $7 clutched in the defendant's hand, the flight of his companion and his ambiguous identification, these factors only became apparent to the police *after* defendant had been physically "grabbed" and subjected to a forcible seizure. Upon final analysis, the sum total of the "specific and articulable facts" available to the police at the moment of the seizure was the seemingly innocuous act of two male Blacks running across a vacant lot in daylight. Such information would at most have justified an inquiry and investigation to determine if criminal activity were at hand (see *People v Jennings,*

*supra).* Consequently, all the evidence which flowed directly from the illegal seizure must be suppressed and the indictment dismissed. Damiani, J. P., Titone, Suozzi, Shapiro and Margett, JJ., concur.