THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALAN
L. FINLAYSON and JAMES BLADES, Appellants.

Second Department, September 22, 1980

### APPEARANCES OF COUNSEL

*Matthew Muraskin (Kent V. Moston* and *Michael J. Obus* of counsel), for appellants.

*Denis Dillon, District Attorney (Juri Toomi* and *Martin I. Saperstein* of counsel), for respondent.

### OPINION OF THE COURT

MOLLEN, P. J.

These appeals present the question of when, if ever, a police officer may detain at gunpoint an individual whom he reasonably suspects of having committed a crime. Our determination necessarily depends upon a delicate balance between the individual's right to personal liberty and society's legitimate expectation that its police officers may carry out their official functions free from unreasonable risk of death or personal harm. We turn first to a review of the pertinent facts.

At approximately 9:00 P.M. on August 10, 1977, Joseph Baxter was alone at a Hess gas station on Peninsula Boulevard in Hempstead, New York. Baxter, the assistant manager of the station, was sitting at its middle island when he observed two men approaching him on foot. When the men

reached him, one asked whether he fixed flat tires, and he replied that he did not. Baxter's suspicions were apparently aroused by the demeanor and conduct of the men, and consequently he activated a silent alarm transmitter which he carried in his pocket. The device was designed to signal a machine in the station's sales office which would then automatically cause a telephone call to be placed to the Hempstead Police Department notifying the police through a prerecorded taped message that a robbery was occurring at the station.

Immediately after he activated the alarm, Baxter's fears were realized. The man who had asked about the repair of the tire now announced a holdup and demanded that Baxter surrender his money. After taking some $35, he instructed Baxter to walk to the sales office, warning him that "I have a gun. If there is [sic] any cops around I will blow your head off."

When they reached the door of the office, the man asked for additional money and searched Baxter's pockets. He discovered the transmitter, and when Baxter would not explain the nature of the device, the man repeated his threat, saying that "There had better not be any cops around or I will blow your head off." Both perpetrators then fled on foot heading southbound on Peninsula Boulevard.

Less than a minute after their departure, Police Officer Alexander Zackavich arrived on the scene in a patrol car. He had been driving alone in the area when he received a radio report of a robbery in progress at the Hess station. The officer drove into the station and observed Baxter running toward him waving his arms. Baxter, whom the officer recognized as the station's manager, urgently signaled him to proceed around the corner onto Taft Avenue which was a quarter of a block south of the station. In response to those signals and without stopping his car, Zackavich immediately drove out of the station and around the corner onto Taft Avenue.

Upon making that turn, the officer observed a vehicle, approximately 150 feet ahead, proceeding away from Peninsula Boulevard. He saw no other automobile and no pedestrians on the street. He turned on the patrol car's flashing lights and sounded its horn in an effort to stop the other vehicle, but it continued moving, turning left at the next intersection. The officer pursued, now blaring his siren in an attempt to compel

the car to stop. It failed to respond, however, until it reached the next intersection where it finally came to a halt.

Officer Zackavich brought his radio car to a stop directly behind the subject vehicle. He then exited his car carrying a shotgun and approached the other vehicle on its driver's side, confronting its two occupants who were later identified as defendants Finlayson and Blades. The officer pointed the shotgun at them and ordered them to place their hands on the dashboard of the car. When they complied, he used the radio he was carrying on his belt to call for a description of the perpetrators.

By this time, Baxter had described the robbers to other officers who had arrived at the scene. The descriptions, which included the perpetrators' sex, race, height, weight, facial appearance and clothing, were transmitted to Officer Zacka-vich. Upon determining that the descriptions matched the occupants of the car, the officer told them that they were under arrest for the robbery at the Hess station. He advised them of their constitutional (Miranda) rights and ordered them to remain as they were while he radioed for assistance. When other police units arrived, the defendants were removed from the vehicle, frisked, handcuffed, and placed in patrol cars. Officers then discovered the proceeds of the robbery secreted under the front seat of the defendants' vehicle. No weapon was found either in the car or on the persons of the defendants.[1]

Later that evening, a lineup was conducted and Baxter identified both defendants as the perpetrators of the robbery. Subsequently, after having been advised again of his constitutional rights, defendant Finlayson confessed to the commission of the crime.

The defendants were jointly indicted for robbery in the second degree and grand larceny in the third degree. Both moved to suppress the proceeds of the crime as well as the potential identification testimony of the complainant Joseph Baxter. Defendant Finlayson also sought suppression of his statements to the police.

A hearing was held on the motions to suppress. The crux of

---

1. The District Attorney represented to the court that, on the morning after the robbery, a discarded but fully loaded .38 caliber revolver was found in front of 96 Taft Avenue. The prosecutor conceded that he was unable to connect the weapon to the defendants and indicated to the court that he would take steps to see that his witnesses would make no mention of the gun during trial.

the defendants' position was that their initial detention at gunpoint had been unlawful and that, consequently, the discovery of the proceeds in the car, the subsequent lineup identification, and Finlayson's confession were all excludable as the tainted fruit of the poisonous tree. The court rejected those arguments, holding that the stop was properly founded upon reasonable suspicion and that Zackavich's use of the shotgun for self-protection did not render his action improper. Accordingly all suppression motions were denied. Thereafter, both defendants pleaded guilty to the charge of robbery in the second degree in full satisfaction of the indictment. They now appeal.

Our analysis begins with the observation that Officer Zackavich did not have probable cause to justify an immediate arrest when he first encountered the defendants on the street, since, at that moment, he lacked sufficient information regarding the identity of the perpetrators. The absence of probable cause, however, is not dispositive of the outcome here since probable cause is not a necessary predicate for all contact between police and the citizenry in the course of a criminal investigation. (See *United States v Mendenhall,* 446 US 544, opn of STEWART, J., in which REHNQUIST, J., joined.) It is settled that, under appropriate conditions, an officer may briefly detain and question a suspect in a public place on information not amounting to probable cause, for, until an actual arrest occurs, the Constitution demands only that the action of the police be justified at its inception and reasonably related in scope and intensity to the circumstances surrounding the encounter. (See *People v Cantor,* 36 NY2d 106, 111; *Terry v Ohio,* 392 US 1, 20; cf. *Dunaway v New York,* 442 US 200.) In assessing such encounters, we speak of a "seizure" even where the officer does not lay hands on the suspect because we recognize that the guarantees of the Fourth Amendment are implicated whenever the police interfere in any significant way with a citizen's freedom of movement. *(People v Cantor, supra,* p 111; *United States v Bringoni-Ponce,* 422 US 873, 878.) Thus, in measuring the lawfulness of police conduct, we are called upon to strike a balance between the citizen's inestimable right to personal liberty and security —his "right to be let alone' *(Olmstead v United States,* 277 US 438, 478, BRANDEIS, J., dissenting)—and the degree to which the seizure is necessary to advance the public interest in the detection of crime and the apprehension of criminals. (See

*People v Howard,* 50 NY2d 583; *People v Cantor, supra,* p 111; *Brown v Texas,* 443 US 47, 50-51.) And in weighing those interests the standard to be applied is that of reasonableness, the touchstone of the Fourth Amendment. (See *People v Chestnut,* 51 NY2d 14; *People v Lemmons,* 40 NY2d 505, 508; *Pennsylvania v Mimms,* 434 US 106, 108-109; *Delaware v Prouse,* 440 US 648, 653-654; *Camara v Municipal Ct.,* 387 US 523.) For "[i]t must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *(Elkins v United States,* 364 US 206, 222; see, also, *People v Rivera,* 14 NY2d 441, 447, cert den 379 US 978.)

The reasonableness standard contemplates and permits a flexible set of escalating police responses, provided only that they remain reasonably related in scope and intensity to the information the officer initially has, and to the information he gathers as his encounter with the citizen unfolds. (Cf. *People v De Bour,* 40 NY2d 210.) The greater the specific and articulable indications of criminal activity, the greater may be the officer's intrusion upon the citizen's liberty. Thus, for example, where the officer entertains nothing more than a hunch or vague suspicion, virtually no interference with the citizen is permissible. Where, on the other hand, the officer possesses knowledge amounting to probable cause to believe that the individual has committed or is committing a crime, he may effect an arrest thereby intruding upon the individual's liberty in the greatest permissible way. In most cases involving street stops, however, the officer acts on something more than a hunch but less than full-blown probable cause, and the courts must then strike a balance, making an *ad hoc* determination based upon the immutable and enduring constitutional standard of reasonableness. (See *Sibron v New York,* 392 US 40, 59-61.)[2]

---

2. *Dunaway v New York* (442 US 200, *supra*) is not to the contrary. There, the Supreme Court (p 212) declined the State's invitation to apply a balancing test where the defendant's detention for custodial interrogation had been "in important respects indistinguishable from a traditional arrest." Where the intrusion is of that magnitude, the court said, only the existence of probable cause will meet the constitutional standard of reasonableness—and this no matter how the State chooses to denominate the detention. Thus the Supreme Court held that, in the absence of probable cause, the police had acted unlawfully in taking the defendant into custody, transporting him to a police station, placing him in an interrogation room, and detaining him there for questioning.

We do not read *Dunaway* as holding or suggesting that an officer may not briefly detain and question an individual in a public place on less than probable cause.

To aid such determinations, the Court of Appeals in *People v De Bour* (40 NY2d 210, *supra)* identified four levels of police intrusion and the degree of knowledge and credible belief needed to justify each. It has now been suggested that recent pronouncements by the Supreme Court have affected, and perhaps undermined, some of the classifications enunciated in *De Bour.* (See *People v Howard,* 50 NY2d 583, *supra; People v Samuels,* 50 NY2d 1035, FUCHSBERG, J., dissenting.) Yet even if this view were correct—a proposition which is hardly free from doubt—the essential value of the *De Bour* holding would survive. *De Bour* did not attempt to establish an inflexible legal framework by which to measure police conduct. Encounters between citizens and the police in public places are of an endless variety with no two being precisely alike. (See *Terry v Ohio,* 392 US 1, 13, *supra.)* Any attempt to catalogue them rigidly within four classifications would not only prove virtually impossible but might well present a true danger of substituting "labels for liberties." *(People v Samuels, supra,* p 1040, dissenting opn of FUCHSBERG, J.) *De Bour* makes no such attempt. Rather, its careful analysis provides needed and effective guidelines for determining the reasonableness, and therefore the constitutionality, of police action in given circumstances.

Among the levels identified in *De Bour (supra)* and elsewhere (e.g., CPL 140.50, subd 1; *Brown v Texas,* 443 US 47, *supra)* is the standard of "reasonable suspicion." That term has been defined as denoting "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand" *(People v Cantor,* 36 NY2d 106, 112-113, *supra),* and it has been consistently held that, where an officer entertains a reasonable suspicion concerning an individual, it is reasonable and therefore constitutional for him to stop and briefly detain that individual for questioning. (See, e.g., *People v Skinner,* 48 NY2d 889; *People v Sobotker,* 43 NY2d 559; *People v Blakely,* 64 AD2d 926; *People v Simms,* 57 AD2d 579; see, also, *People v Samuels, supra,* COOKE, Ch. J., concurring; *Brown v Texas, supra,* p 51.) In the case at bar we need examine no other level of belief since we conclude that, when Officer Zackavich

---

Indeed, in cases decided after *Dunaway,* both the Supreme Court and our own Court of Appeals have recognized that, in proper circumstances, such police conduct is constitutionally permissible. (See, e.g., *Brown v Texas,* 443 US 47, *supra; People v Skinner,* 48 NY2d 889.)

first came upon the defendants on the street, he had sufficient grounds to form a reasonable suspicion that they had perpetrated a robbery at the Hess station.

The officer received and was entitled to rely upon the radio report of a robbery in progress at the station. (Cf. *People v Lypka,* 36 NY2d 210.) He testified that he arrived at the scene only some six seconds after having received that report and that upon driving into the station, he was immediately met by Baxter who urgently signaled for him not to stop but to continue around the corner onto Taft Avenue. From this, it was eminently reasonable for the officer to conclude that the perpetrators had left only moments before and had themselves turned onto Taft. When he turned the corner, he saw no pedestrians and no vehicles other than the defendants' car which was then proceeding away from the scene of the crime.

■ At the hearing, counsel attempted to establish that there were escape routes—alleyways and the like—which could well have accommodated the perpetrators. It was possible that the actual perpetrators had taken one of those routes and that the occupants of the lone vehicle on the street were innocent of any wrongdoing. Yet in dealing with the standard of reasonable suspicion, as with the higher standard of probable cause, we do not require certainty. (See *People v McLaurin,* 43 NY2d 902, revg 56 AD2d 80 on dissenting opn of NUNEZ, J.; *People v Sustr,* 73 AD2d 582, 583; cf. *Brinegar v United States,* 338 US 160, 175.) Were it otherwise, virtually no stop or arrest would pass constitutional muster. The mere possibility that the occupants of the vehicle were not the actual perpetrators did not require Officer Zackavich to simply shrug his shoulders and permit the car to proceed on its way unimpeded. (See *Adams v Williams,* 407 US 143, 145.) In our view, the station manager's urgent signals pointing toward Taft Avenue, the proximity of time and location between the occurrence of the robbery and the observation of the defendants, the fact that no one else was seen at that time of night in what was described as an industrial area, and the apparent refusal of the defendants to stop their car when initially signaled to do so, all combined to provide Officer Zackavich with sufficient grounds to entertain a reasonable suspicion that the occupants of the vehicle had committed the crime. He was therefore entitled, and indeed was duty bound, to stop the car and detain its occupants for questioning. (See *People v Rivera,* 14 NY2d 441, cert den 379 US 978, *supra; Delaware v Prouse,*

440 US 648, *supra;* cf. *People v Sobotker,* 43 NY2d 559, *supra.)* He did precisely that, pursuing the vehicle until it finally responded to his signals and came to a halt.

■ In view of our holding that the defendants' car was properly stopped, we are next obliged to determine whether the scope and intensity of the ensuing police conduct remained reasonably related to the circumstances surrounding the encounter. Clearly, a stop which is justified at its inception may be rendered unlawful by unwarranted police action taken as the confrontation progresses. *(Terry v Ohio, supra,* p 18; *Go-Bart Co. v United States,* 282 US 344, 356-358; cf. *People v Stewart,* 41 NY2d 65, 66-67.) The defendants here strenuously contend that, even if the stop were initially justified, Officer Zackavich impermissibly raised the level of intensity of the encounter when he approached their car with a shotgun, pointed the weapon at them, and held them at gunpoint while he radioed for further information. We disagree.

At the outset, we note that the Court of Appeals has recently rejected the notion that whenever an officer approaches a citizen with weapon drawn he effects an arrest supportable only by probable cause. *(People v Chestnut,* 51 NY2d 14, 21, *supra;* see, also, *United States v Bull,* 565 F2d 869, 870, cert den 435 US 946.) It is true, of course, that a confrontation with a policeman is considerably more intense when the officer displays his weapon than when he does not. (Cf. *People v Barbera,* 71 AD2d 231; *People v Figueroa,* 58 AD2d 655, 656.) Yet other weighty considerations are often at work in such situations, and among the most important is the safety of the officer. In that regard we have only recently restated "our firmly held view that an officer undertaking a legitimate inquiry is entitled to proceed free of unreasonable risk of personal harm" *(People v Earley,* 76 AD2d 335, 342), and the Supreme Court itself has recognized that a police officer's safety is an important consideration in the resolution of Fourth Amendment issues. (See *Pennsylvania v Mimms,* 434 US 106, 110, *supra; Adams v Williams,* 407 US 143, 146, *supra; Terry v Ohio,* 392 US 1, *supra.)* To reconcile the officer's right of self-protection with the citizen's right to personal liberty we need only look, once again, to the constitutional standard of reasonableness.

An officer may take appropriate self-protective measures when he lawfully confronts an individual and reasonably believes him to be armed or otherwise dangerous to the officer

or others. The usual police response will be to conduct a frisk, patting the individual's clothing in search of a weapon. (E.g., *Terry v Ohio, supra; People v Mack,* 26 NY2d 311.) Where an immediate frisk is not feasible, however, the officer will be justified in approaching the suspect with weapon drawn or at the ready. (See *People v Chestnut, supra; People v Brnja,* 50 NY2d 366; *People v Griffith,* 48 NY2d 1009; *People v Huffman,* 41 NY2d 29, 34; *People v Shivers,* 21 NY2d 118, 122; *People v Earley, supra; People v Jackson,* 72 AD2d 149; *People v Simms,* 57 AD2d 579, 580, *supra; People v Wiggins,* 50 AD2d 910; *People v Bronk,* 66 Misc 2d 932, 934, affd 31 NY2d 995.)[3] The key question in all cases remains whether the protective measures taken by the officer were reasonable under the circumstances. *(People v Chestnut, supra,* p 23.)

Thus, for example, if an officer were to draw his weapon against an individual suspected only of shoplifting or some other petty offense, the intensity of the confrontation, in the absence of any independent indication of danger, would be raised to a level well beyond that which could be justified as reasonably related to the surrounding circumstances. Such an encounter would then be deemed an arrest supportable only by probable cause. (Cf. *People v Cantor,* 36 NY2d 106, *supra.)* In contrast, if the individual were suspected of a serious or violent offense, the officer's resort to his weapon, standing alone, would not transform the confrontation into an arrest. Instead, it would be deemed a permissible act of self-protection provided only that it was reasonably related to specific and articulable facts from which it was reasonable to infer that the suspect was armed and dangerous. *(Terry v Ohio, supra,* p 27.)

In essence, then, we speak of two separate areas of knowledge and belief. The first involves information pointing to the individual as the perpetrator of the crime. This establishes the predicate for the initial police intrusion upon the individual's liberty, and it is fundamental that no frisk or gunpoint approach may ever be sanctioned in the absence of a sufficient predicate entitling the officer to stop and detain the individual in the first instance. (Cf. *People v Earl,* 40 NY2d 941, revg 50 AD2d 289 on dissenting opn of SHAPIRO, J., cert den 431 US

---

3. Indeed the language of some cases in the area seems to suggest that, for Fourth Amendment purposes, a gunpoint approach would actually be less intrusive than the laying on of hands involved in a physical seizure and pat-down frisk. (See *People v Stewart,* 41 NY2d 65, 69, *supra; Sibron v New York,* 392 US 40, 64, *supra.)*

943.) The second area of knowledge and belief concerns information from which it can reasonably be inferred that the suspect is armed and dangerous. The officer's right to take protective action derives from and is measured against this second area of knowledge, and the question of whether his apprehension of danger was reasonable will necessarily turn upon an examination of the totality of the surrounding circumstances. These might well include the time of day and the location at which the confrontation takes place, the number of suspects in relation to the number of officers present and, of course, the nature of the suspected offense. (Cf. *United States v Bull,* 565 F2d 869, 870, cert den 435 US 946, *supra.)* And, once again, we do not require certainty. *(People v Chestnut,* 51 NY2d 14, *supra; Terry v Ohio, supra,* p 27.)

Moreover, in assessing these confrontations, *it is absolutely essential that courts reach determinations based not upon some abstract or illusory notion of what police-citizen encounters ought to be like in an ideal world but upon an objective evaluation of the realities of the encounter as it occurred.* (See *Elkins v United States,* 364 US 206, 222, *supra; People v Rivera,* 14 NY2d 441, 446, cert den 379 US 978, *supra; People v Cunningham,* 71 AD2d 559, 560; see, also, *People v Crippen,* NYLJ, March 14, 1980, p 6, col 4.) The reasonableness of the officer's conduct must depend upon the actualities of life under the circumstances in which the confrontation takes place including, although not limited to, his reasonably based fears growing out of the occurrence of prior acts of violence directed at the police. Tragically, attacks upon policemen seem to have become almost commonplace in modern urban society, and courts simply cannot remain unmindful of the alarming frequency with which they occur, for as CARDOZO, J., warned, "we are not to close our eyes as judges to what we must perceive as men." *(People ex rel. Alpha Portland Cement Co. v Knapp,* 230 NY 48, 63; see, also, *Watts v Indiana,* 338 US 49, 52.)

In the case at bar, Officer Zackavich found himself approaching a vehicle occupied by two men whom he reasonably suspected of having committed a robbery. He was alone. It was nighttime. The encounter was taking place in a deserted industrial area. The crime under investigation was a holdup at a gas station. Although conceivably such a crime could have been perpetrated by individuals who were unarmed, that was not a likely possibility and it was reasonable for the

officer to assume to the contrary. Zackavich did not conduct a frisk, but that option was hardly inviting since the two suspects were seated in a car as he stood outside. And, indeed, the Supreme Court has "specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." *(Pennsylvania v Mimms,* 434 US 106, 110, *supra;* see, also, *Adams v Williams,* 407 US 143, 148, n 3, *supra.)*

■ Simply put, then, Officer Zackavich had a reasonable basis to believe that he was coming face-to-face with two armed robbers who were unwillingly submitting to contact with him after having unsuccessfully attempted to evade him. Under these circumstances, the officer was justified in fearing that any request for information might well be answered with a bullet. *(People v Rivera,* 14 NY2d 441, 446, cert den 379 US 978, *supra.)* It was therefore reasonable for him to hold the defendants at gunpoint as he quickly called for additional information which would either confirm the defendants as the perpetrators or expeditiously establish their innocence and permit them to continue on their way. (See *People v Chestnut, supra; People v Blakely,* 64 AD2d 926, *supra.)* As it happened, the descriptions transmitted to the officer matched the defendants thereby elevating the level of inference from reasonable suspicion to probable cause for an arrest. (See *People v Brnja,* 50 NY2d 366, *supra; United States v Purry,* 545 F2d 217.) And once probable cause was established, the subsequent search of the vehicle, which resulted in the discovery of the proceeds of the crime, was fully warranted and lawful. (See *Chambers v Maroney,* 399 US 42; *Carroll v United States,* 267 US 132.)

Under the totality of the circumstances, we hold that Officer Zackavich's conduct was entirely proper. He had reasonable suspicion sufficient to support the stop of the defendants' car in the first instance. He had reasonable grounds to believe that the defendants were armed and dangerous and was therefore justified in briefly detaining them at gunpoint as they sat in their car. And, upon receiving the descriptions, he had probable cause to place the defendants under arrest.

■ Significantly, the very same result is required when the case is measured against the policy considerations underlying the very exclusionary rule which the defendants seek to invoke. Among the primary purposes of the rule is to deter official lawlessness by denying to the government the fruits of its own misconduct. (Cf. *United States v Calandra,* 414 US

338, 347.) In resolving the conflicts that often arise between private rights and the public interest, our society has decided that, to safeguard the cherished rights guaranteed by the Constitution, it is willing to see "[t]he criminal * * * go free because the constable has blundered." *(People v Defore,* 242 NY 13, 21.) We do not retreat from this principle since it remains the only meaningful way to protect against violation of invaluable constitutional rights. Yet, surely, it neither serves the interests of society nor advances constitutional values for our courts to strive for ways to permit criminals to go free in the absence of evidence that the police have, in fact, engaged in any misconduct. (Cf. *United States v Payner,* 447 US —, —, 48 USLW 4829, 4831.)

The application of the exclusionary rule presupposes the existence of unlawful or improper police conduct. In this case, however, we are unable to identify anything that Officer Zackavich did that was wrong or unreasonable. Clearly, he was duty bound to stop the defendants' vehicle to make inquiry. And we do not perceive that any constitutional provision would require a lone officer to approach two suspected armed robbers who are seated in a car without drawing his own weapon. Were it otherwise, policemen would be compelled to choose whether, on the one hand, to forego their sworn duty to uphold the law or, on the other hand, to face serious and unnecessary risk of death or personal harm. The police officer, in the instant circumstances, acted promptly and efficiently in fulfilling his responsibilities as a law enforcement officer. The fact that he did so in a prudent and reasonable manner, with proper regard for his personal safety, did not constitute a violation of defendants' constitutional rights. As the court warned in *Terry v Ohio* (392 US 1, 15, *supra):* "[A] rigid and unthinking application of the exclusionary rule, in futile protest against practices which it can never be used effectively to control, may exact a high toll in human injury and frustration of efforts to prevent crime."

Society cannot and should not demand of its policemen that, in fulfilling their responsibilities as law enforcement officers, they needlessly and unreasonably expose themselves to serious injury or death. Certainly, nothing in the Constitution requires that they do, for, as the Supreme Court observed when it first made the exclusionary rule binding on the States, "[t]here is no war between the Constitution and common sense." *(Mapp v Ohio,* 367 US 643, 657.)

The judgments of conviction should be affirmed.

LAZER, GIBBONS and MARGETT, JJ., concur.

Two judgments (one as to each defendant) of the County Court, Nassau County, both rendered January 26, 1979, affirmed.

This case is remitted to the County Court, Nassau County, for further proceedings pursuant to CPL 460.50 (subd 5).