OPINION OF THE COURT
Alan Broomer, J.
Can probable cause be based on the word of a two year old? That is the only serious (and novel) question raised at a combined Mapp and Huntley hearing.
THE FACTS
On December 15,1983, Detective Harold Diamond, an 18-year veteran of the New York City Housing Authority Police Department, was summoned to 2940 West 31st Street, apartment 3A. Uniformed officers posted at the crime scene told Detective Diamond what they had seen and learned about what had earlier occurred in the apartment.
Two of the occupant’s children had returned from school and finding the door unlocked assumed the apartment had been burglarized. They summoned aid from a neighbor who entered the apartment and found Thelma (another of the occupant’s *723 children) badly beaten, lying dead between two beds. That day, she had been baby-sitting her younger sister Felicia (two years and four months old). The child was still in the apartment, unharmed.
Detective Diamond entered the apartment. The walls and floors of the foyer, living and back bedroom were covered with blood. Broken glass was everywhere; the blood on the walls and floors was smeared in many places. The deceased was lying face down in a twisted position between the single beds.
The detective went to apartment 3D where the young siblings of the deceased were waiting. Felicia was being bathed by a Sharon Rivera. She was giggling and talking to Sharon. Detective Diamond noted the rapport between the two and asked Sharon to question Felicia about what had happened and report to him her answers. A few minutes later Sharon returned and told the detective she had asked Felicia, “Who hit Thelma?” The child told her “Cutty, Mike and May.”
He then went into the public hallway which was crowded with onlookers. He ordered the crowd to disperse. Amongst the group was a teen-ager, whose sullen shuffle caught the detective’s attention.
“Son, where do you live?
“I live in the building.
“All right. Do you live on this floor?
“No.” The youngster started shuffling again.
Detective Diamond called out to him, “Where does Mike live?”
“8G” was the immediate answer.
The detective “grabbed” one of the uniformed officers, walked up to 8G and knocked on the door several times; there was no answer.
At this point, he heard the elevator stopping on the floor, just around the bend of the hallway. A young man turned the corner and walked towards the two officers who stood at the door of apartment 8G. He looked at them and asked, “Who are you looking for?”
The detective replied “What is your name?”
“Michael.”
As Michael approached, the detective asked him where he was coming from. To which he replied, “I was out in the street playing.”
“Where do you live?”
“Apartment 8G.”
*724 Detective Diamond looked Michael over and noticed he was wearing a World War I aviator’s cap, which he was asked to remove. He had fresh scratches on his forehead, which he claimed he had received in a fight in the “reefer house” the day before.
He was asked to open his blue denim jacket. Underneath was a red T-shirt. He wore khaki pants. Neither garment had blood on it. However, his sneakers caught the detective’s attention. Although they were worn, they had several light areas indicating recent cleaning.
At this point, Detective Diamond noticed the red T-shirt was fluttering in the heart area. He put his hand over the young man’s heart and felt it was pounding wildly.
“What are you scared of?
“I am always afraid when the police talk to me.”
The detective again looked at the sneakers which appeared to have been freshly cleaned. He asked for one of the sneakers, then examined it closely. At a point where the sneaker top met the sole, he saw several red spots which he believed were blood. The same procedure was repeated with the other sneaker; the same red spots were seen. The sneakers were retained and the young man was asked to accompany the officers to the third floor. The investigation continued, eventuating in two confessions and a warranted search of apartment 8G which disclosed blood-spattered pants.
The Mapp, Huntley and Dunaway issues were decided from the Bench after a hearing. This opinion addresses the significance of the two-year-old informant, a truly novel issue.
THE LAW
PROBABLE CAUSE
Early in our history, probable cause meant “a seizure made under circumstances which [would] warrant suspicion” (Locke v United States, 7 Cranch [11 US] 339, 348). Since that case was decided more than “bare suspicion” has been required. Today probable cause exists where “the facts and circumstances within [police officers’] knowledge and of which they [have] reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that [an offense has been committed]” (Carroll v United States, 267 US 132,162).
The degree or quantity of proof does not reach or even approach that which is required for a conviction. If the requirements were similar, officers at crime scenes or engaged in *725 pursuit of criminals would have to withhold action or pull up short awaiting proof sufficient to convincé a trial jury of guilt. Under those circumstances, the public interest could not be served and hardly any offenders would be arrested (Brinegar v United States, 338 US 160, 175).
The standards are commonsensical not technical. “[T]hey are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act” (Brinegar v United States, supra, at p 175).
The standard of probable cause is designed to protect people against arbitrary or whimsical stops and searches, essentially unreasonable ab initia. However, it is designed to give the police some breathing room, some flexibility in enforcing the law for the community’s protection. It is recognized that the police are often confronted by rapidly unfolding circumstances, frequently fraught with danger under conditions where the import of what they have encountered is seldom clear. It would be intolerable were they to do nothing while awaiting the requisite proof. Accordingly, the police may make some mistakes as long as they are those of reasonable men “acting on facts leading sensibly to their conclusions of probability” (Brinegar v United States, supra, at p 176).
Our courts have recognized that the reasonableness of police behavior must be determined by the significance the events have to the particular police officer. His entire experience must be taken into account in weighing the reasonableness of his “wet” computer printout. To ignore the factors giving rise to his inferences of probability is as foolish as it is unfortunate. Such action is akin to that of a western traveler to the Kalahari reacting in ignorant disbelief after seeing his bushman guide (bushmen are fabled trackers) squat beside the trail for a moment and on the basis of a brief examination of the spoor déclare: “Three Kudu passed this way not a half hour ago, one a pregnant cow about to give birth, one a young female, the other’s offspring and the third a young male who is lame in his right rear leg.” The westerner, splendidly outfitted in his Abercrombie & Fitch bush jacket and pith helmet, looks at the spoor and sees only dust.
Specialized expertise of trained police officers has been recognized in a probable cause context (see People v Valentine, 17 NY2d 128,132; People v Brady, 16 NY2d 186,189; Terry v Ohio, 392 US 1, 27; Bell v United States, 254 F2d 82, 86; Jackson v United States, 302 F2d 194, 196).
*726 Due consideration must be accorded an officer’s “trained instinctive judgment operating on a multitude of small gestures and actions impossible to reconstruct” (Sibron v New York, 392 US 40, 78 [Harlan, J., concurring opn]).
Judge Jasen, dissenting in People v Brown (24 NY2d 421, 425), points out that: “Police officers patrolling the streets do not prearrange the setting within which they operate. They do not schedule their steps in the calm and refleqtive ^atmosphere of some remote law library. Events occur without warning and policemen are required as a matter of duty to act as a reasonably prudent policeman would under the circumstances as those circumstances unfold before him.” (See, also, People v Chapman, 103 AD2d 494; People v Finlayson, 76 AD2d 670, 675.)
After Detective Diamond had viewed apartment 3A he knew a particularly bloody, violent murder of a young woman had just taken place and that it had been witnessed by the very young sister of the deceased. The focus was on who did it, not on whether a crime had been committed. The answer was quickly forthcoming — Cutty, Mike and May. The problem then became finding the right Cutty, Mike or May. Again events quickly narrowed the focus.
The police often know who committed a particular crime long before they have the evidence to make an arrest. There are some who think cases are solved by detectives poring over a crime scene magnifying glasses in hand, or by making Holmesian deductions in brilliant fashion. The police themselves have encouraged the myth. (It seems each profession has its little secrets.) Those who know better are aware cases are broken through information. In police parlance “a good snitch is worth 10 laboratories.”
Detective Diamond, an 18-year veteran, impressed me as a wise and savvy cop. He undoubtedly believed that the identity of the killer was known to some who lived in that housing project. The shuffling teen-ager conveyed a certain awareness to the astute and sensitive detective who played a hunch that paid off. “Where does Mike live?” brought forth an immediate and focused reply, “8G.” Significantly, he did not first ask which Mike or what Mike or Mike who. There was an immediate meeting of the two minds. It was as though the question were, “Where does Mike, who did this, live?” and the answer was “Mike, the one you’re looking for lives in 8G”. On some level nonverbal communications outweigh the verbal and one person knows what another is talking about even though the thoughts are expressed imprecisely or in few words.
*727 That the detective knew he had a “hit” is underscored by his immediate response, “I grabbed one of the cops and took the stairs to the eighth floor.”
If any doubt remained that Detective Diamond had the right Mike, it dissipated when he saw the freshly cleaned sneakers on Mike’s feet. At that point he certainly had probable cause and he could search the person of the defendant, as indeed he did.
While on the defendant’s feet, the sneakers were in plain view open to the gaze of anyone interested enough to look (Chimel v California, 395 US 752).
The initial questioning in the hallway and the answers that followed may be received pursuant to CPL 140.50 and under the common-law right of initial inquiry where the officer has a founded suspicion of criminality afoot (Terry v Ohio, 392 US 1, supra), or as initial on-scene questioning, not to obtain evidence but to clarify the situation (People v Rodney P. [Anonymous], 21 NY2d 1). I hold further that the questioning was not custodial; it was in a public hallway outside the defendant’s own residence. Under the circumstances an innocent man in Thames’ position would not have thought he was in custody (People v Yukl, 25 NY2d 585, cert den 400 US 851).
I find that Detective Diamond’s requests of the defendant to remove his cap, open his jacket and remove his sneakers for a closer inspection were searches and a seizure. What they revealed may be received as the product of a search based on probable cause. The constitutents of probable cause focusing attention on the defendant as the perpetrator of a very recent bloody murder were the name “Mike” received from the child informant, the identity of Mike as living in 8G, Mike’s identifying himself and the freshly scrubbed sneakers observed in plain view. If the hat and jacket incidents preceded the sneaker observations, the intelligence they provided would have been shortly revealed in any event after the sneaker observations. Since they are not relied on for a finding of probable cause, they may be received under the alternative doctrine of inevitable discovery (People v Fitzpatrick, 32 NY2d 499, cert den 414 US 1033).
THE YOUTHFUL INFORMANT
In the criminal law, the role of the informer has been troublesome but necessary. Informers are recognized to fall into several categories and appropriate tests of their reliability have been formulated by the courts.
*728 The paid or professional informant is the most suspect, for obvious reasons. His information must be weighed by the two-pronged Aguilar-Spinelli test, i.e., reliability of the informant and his basis of knowledge (Aguilar v Texas, 378 US 108; Spinelli v United States, 393 US 410; see, also, People v Elwell, 50 NY2d 231). This standard has recently been modified by a less stringent “totality of circumstances” test (Illinois v Gates, 462 US 213).
A second category is the anonymous tip or “911” informant,. Police are warranted in acting upon information received from undisclosed citizen informants. However, if later challenged in court their actions must be shown to have been justified under all the circumstances (People v Lypka, 36 NY2d 210). This can be done by showing that the information supplied was sufficiently specific that the officers were able to verify its accuracy by their own observations at the scene (Draper v United States, 358 US 307; People v Benjamin, 51 NY2d 267; People v Santiago, 52 NY2d 865).
The third and most trustworthy class of informants is made up of ordinary citizens whose identity is known to the police. These are people who call the police or stop a radio car on the street to report crimes they have witnessed or evidence of criminal activity that they know about. Citizen informants are presumptively reliable and in the absence of any questioning fact or motive to falsify, their information may be relied upon (Jaben v United States, 381 US 214; People v Hicks, 38 NY2d 90; People v Brown, 28 NY2d 282). An additional safeguard is the possibility of prosecution for the intentional giving of false information to the police (Penal Law, § 240.50) or indictment for perjury where the data was sworn.
In our case, young Felicia Brown clearly falls into category three. She is not old enough to be capable of guile or have biased and improper reasons to accuse the defendant falsely. However, her extreme youth, while removing the likelihood of a motive to give false information, may put in doubt her reliability. Were she an adult or even an adolescent, the police would have been duty bound to act on her information.
The capacity of a child as a witness is questioned. Children over 12 years of age are presumptively competent and may give sworn testimony. Younger children may also be sworn if a court is satisfied they understand the nature of an oath. Even where they dó not they may still testify, unsworn, where they are found to have the requisite intelligence and capacity (CPL 60.20).
*729 It is not uncommon for average children of eight or older to give sworn testimony. Precocious or intelligent five or six year olds often testify cogently and intelligently. However, some remain suspicious of the testimony of children because “they make things up” or they have “vivid imaginations” or are subject to suggestion from adults or may internalize that which they overhear.
It must be stressed, however, that Felicia’s role is not that of witness but that of informant. The traditional objections to children as witnesses do not apply to Felicia as an informant where her role is solely that of naming the one who “hit Thelma.”
Recent studies conducted by psychologists indicate very young children may have recall ability superior to that of adults and may take note of seemingly inconsequential details ignored by older people. While children may remember fewer details of an event than adults, five and six year olds were as accurate as college students in later identifying a culprit who in an experiment burst into a classroom and left after a 15-second harangue (New York Times, Nov. 6, 1984, section c, p 1, col 1).
There are few reported cases involving very young informants and none have been found where the informant was two years and four months old.
In Washington v United States (414 F2d 1119) the appeals court, utilizing its power to review plain error in the record, found nothing exceptional in the role of two eight year olds leading the police to the residence of an adult principal and identifying him within to the police, despite the fact that the boys were the adult’s accomplices in a very recent burglary. A California appellate court, on similar facts, reached the opposite result) The juvenile informants’ (ages not stated) reliability was found lacking as judged by conventional tests. The court was unwilling to find that juveniles were any more trustworthy than adults. It is significant that the court did not find them less reliable because of their youth (Pollock v Superior Ct., 272 Cal App 2d 548).
The instant case raises none of the traditional grounds to suspect Felicia’s truthfulness. Since she was not called upon to relate an event, there was no danger her imagination played a part in her answer. A great deal of time had not passed; the events were only a few hours old. She was not subjected to influence or suggestion. Nor was she an accomplice or in any other way involved in the terrible killing that had just occurred other than that she was a witness to it all. She was asked the *730 simple question, “Who hit Thelma?” and responded just as simply and directly, “Cutty, Mike and May.”*
CONCLUSION
Where a young girl had very recently been murdered and her two-year-old sister was obviously present throughout the episode, it was assuredly good police work to ask of the child, “Who did it?” Having received the name Mike from the child and ascertaining that Mike lived in the same building, in apartment 8G, it was incumbent upon the investigating detective to find Mike and as unobtrusively as possible confirm or contradict what the child had just said. Once the detective saw the freshly scrubbed sneakers (he knew the killer had tracked through the bloody floors of the killing apartment) he had sufficient confirmation that this was indeed the right “Mike” and could proceed with a proper search and arrest of the defendant.
The motion to suppress is denied.

 Who or what Cutty and May (Mae) are has never been established.