■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RUSSELL BROCKINGTON, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (G. Goldstein, J.), rendered December 7, 1988, convicting him of criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress physical evidence.

Ordered that the judgment is reversed, on the law and the facts, the motion is granted, the indictment is dismissed, and the matter is remitted to the Supreme Court, Kings County, for the purpose of entering an order, in its discretion, pursuant to CPL 160.50.

The record reveals that an undercover police officer entered a location known for trafficking in narcotics, where he purchased two vials of crack cocaine from two men. The defendant was not seen at the location at any time during the officer's purchase. Following his purchase, the undercover officer radioed his back-up team with descriptions of the two suspects and directed them to the location.

When another police officer responded to the location where the drug sale had taken place, he observed a man, fitting the description of one of the suspects, along with another man, later identified as the defendant, both moving hurriedly into an apartment. The officer ordered them out into the hallway, where he conducted a pat-down search of each individual. Nothing was found on the individual who fit the description given to him by the undercover officer. However, the officer felt a "large bulge" in the defendant's front left pants pocket, which he believed to be vials of the type used to package crack cocaine. Although the officer did not believe that the bulge was a weapon, he nevertheless put his hand into the defendant's pocket and removed 135 vials of crack cocaine and $481. Among the bills recovered from the defendant were two $10 bills of prerecorded "buy" money that the undercover officer had used to purchase the two vials of crack cocaine earlier that day.

Under the circumstances, the police officer acted unreasonably in searching the defendant's pockets after determining that he was unarmed. The record is devoid of any indication that the arresting officer reasonably suspected that he was in danger of physical injury at the time he reached into the defendant's pocket. Once a reasonable fear for safety had abated, the police were required to discontinue their search. Accordingly, the subsequent seizure of contraband from the defendant's pockets was improper (see, People v Roth, 66 NY2d 688, 690; People v Montero, 149 AD2d 628, 629; People v Vullis, 131 AD2d 616, 617). Therefore, the physical evidence must be suppressed and the indictment dismissed.

In light of this determination, the defendant's remaining contention need not be addressed. Kunzeman, Miller and O'Brien, JJ., concur.

Thompson, J. P., dissents and votes to affirm, with the following memorandum: I simply cannot adopt the position of the majority which fails to gauge the reasonableness of the police officer's conduct in the circumstances of this case within the context of the harsh realities of the burgeoning crack cocaine epidemic existing on the hard streets of New York City's boroughs and which position further demands that police officers ignore the clear signs of contraband in a drug-infested location fortuitously uncovered during a precautionary frisk for weapons. In my opinion, neither the State nor the Federal constitutional privacy guarantees (US Const 4th Amend; NY Const, art I, § 12) require a police officer to close his or her eyes to the unmistakable presence of narcotics on a suspect's person on the ground that his or her reasonable fear that the suspect was armed turned out to be unfounded. Accordingly, I vote to affirm.

The defendant was arrested during a "buy and bust" operation conducted by the Brooklyn North Narcotics District of the New York City Police Department. Police Officer Frank Kregler, a member of the team participating in the buy and bust operation and the sole witness at the suppression hearing, is an experienced narcotics officer. During his two years with the Brooklyn North Narcotics District, Officer Kregler had been involved in approximately 200 drug arrests. In addition, Officer Kregler had previously been assigned to the Brooklyn South Narcotics District as an undercover officer and had made a dozen or more narcotics buys.

On September 23, 1987, Officer Kregler was acting as backup for an undercover buy operation at 522 Lexington Avenue, an abandoned building in Brooklyn. Officer Kregler was familiar with the location as one where he had made drug arrests in the past. There had also been a number of citizen complaints about drug transactions at that location.

At approximately 7:40 P.M. Officer Kregler, who was in an unmarked vehicle dressed in plainclothes at a site near the buy location, received a radio communication from an undercover officer stating that he had purchased two vials of crack cocaine from two men at 522 Lexington Avenue. The undercover officer provided a detailed description of the two men and indicated that one of the men was standing outside in front of the building and the other was inside the building. Moments after this transmission, Officer Kregler received a radio communication from the sergeant supervising the operation directing him to proceed to the site of the buy.

As he approached the buy location, Officer Kregler observed a man meeting one of the descriptions provided by the undercover officer, standing in the doorway of 522 Lexington Avenue. Officer Kregler stopped in front of the building, exited the unmarked vehicle with his gun drawn and exhibiting his shield on his outer clothing, and, identifying himself as a police officer, placed this individual against the wall of the building. This man was later identified as the codefendant Thomas Charlemagne. As Officer Kregler was placing Charlemagne against the wall, he pushed open the door to the building and saw a man also matching one of the descriptions provided by the undercover officer running up the stairs. Officer Kregler turned Charlemagne over to another officer and pursued the individual up the stairs. When Officer Kregler reached the third floor landing, he observed the man, later identified as the codefendant Jesus Vasquez, and another male, identified as the defendant, running into an apartment. Officer Kregler shouted "Police, don't move". He then ordered Vasquez and the defendant to come out of the apartment into the hallway and place their hands against the wall above their heads. He conducted a pat down search of their exterior clothing. The frisk of Vasquez produced no weapon or contraband. When Officer Kregler patted down the defendant, he felt a large bulge in the left front pants pocket. The bulge felt to Officer Kregler like a handful of hard plastic vials of the type he knew were used to package "crack cocaine". He had recovered similar vials at least a hundred times in the course of his work as a narcotics officer. Officer Kregler reached into the defendant's pocket and recovered a brown paper bag containing 135 vials of a rock-like substance which later analysis revealed to be crack cocaine. Also recovered from the defendant's pocket was a large wad of money totalling $481 including two $10 bills of prerecorded "buy" money.

Upon these facts, the suppression court held that the police officer acted reasonably in stopping and frisking the defendant. The defendant's motion to suppress the physical evidence (the drugs and money) was, therefore, denied. I would affirm.

Analysis of the stop and frisk issue must necessarily begin with the recognition that not all searches and seizures are forbidden under the Fourth Amendment of the United States Constitution and the parallel provision of our State Constitution, but only unreasonable searches and seizures (see, People v White, 156 AD2d 741, 742; People v Finlayson, 76 AD2d 670, 675, cert denied 450 US 931). Implicit in the majority's deci-

sion is a finding that Officer Kregler was justified in engaging in a precautionary "stop and frisk" procedure predicated upon a reasonable suspicion of ongoing criminality and on an articulable basis to fear for his own safety and well-being *(see, e.g., Terry v Ohio,* 392 US 1, 27; *People v Torres,* 74 NY2d 224, 226; *People v Salaman,* 71 NY2d 869, 870; *People v Benjamin,* 51 NY2d 267, 270). However, the determination reached by my colleagues in the majority would place unrealistic restraints upon the officer's authority to complete the frisk by retrieving the unmistakable evidence of contraband from the defendant's pocket. While this fine line of demarcation defining the parameters of reasonableness of police conduct may be workable in the reflective calm of the courthouse, it is not warranted when measured against the harsh reality of the present drug epidemic. In my opinion, it would be ludicrous to require a police officer to turn a blind eye to the clear presence of contraband discovered in the course of a frisk for weapons simply because the officer had first satisfied himself that no immediate threat to his safety existed. The discovery of the crack cocaine occurred while the officer was engaged in lawful conduct and entailed only a minimally more intrusive search than that involved in the pat down of the defendant's outer clothing.

In reaching this conclusion, I am fully aware of the body of precedent that once any reasonable basis for a police officer's fear for his safety has abated, the police officer must discontinue his search *(see, Terry v Ohio, supra; Sibron v New York,* 392 US 40; *People v Roth,* 66 NY2d 688, 690; *People v Montero,* 149 AD2d 628; *People v McGriff,* 99 AD2d 818). Strict adherence to the letter of the law as espoused in these decisions would not, upon the facts of the matter before us, further the constitutional objective of curtailing unreasonable searches and seizures. Rather, our analysis must be tempered by a realistic perception of present day culture *(see, People v McRay,* 51 NY2d 594, 598; *People v Thomas,* 143 AD2d 696, 699). The standard of reasonableness must be viewed against the backdrop of the widespread traffic in cocaine in which the clear plastic vial has become the "hallmark" of this illicit drug trade *(see, People v Goggans,* 155 AD2d 689; *People v Way,* 147 Misc 2d 821, 824; *People v Small,* 144 Misc 2d 560, 562; *cf., People v McRay, supra).* Although plastic vials undoubtedly have legitimate uses, the officer's discovery must be viewed in context. Officer Kregler was a highly experienced narcotics officer. He was fully familiar with the methods of operation in the narcotics trade and the packaging of drugs.

The encounter in a location known for the trafficking in narcotics in close proximity to a sale of crack cocaine and following an effort by the defendant to escape detention by the police would strongly suggest that the defendant was engaged in criminal activity and the vials he possessed on his person contained crack cocaine. While I am not proposing that the constitutional guarantees against unreasonable searches and seizures be abandoned in response to the current drug epidemic, I am of the view that under the circumstances of this case the officer acted reasonably by reaching into the defendant's pocket and retrieving the vials of crack cocaine (see, People v Perez, 161 AD2d 810; cf., People v Mack, 162 AD2d 624). For the foregoing reasons, I respectfully dissent.