OPINION
{¶ 1} Arthur McKinley, Jr., appeals from his conviction of cultivating marijuana pursuant to his no-contest plea. The facts surrounding McKinley's arrest are not in dispute and are set out in the State's brief: *Page 2 
 {¶ 2} "On April 7, 2005, around 5:45 p.m., Officers Gerald Humston and Ronald Velez of the Dayton Police Department were dispatched to 2908 East Third Street on a `burglary-in-progress' call. When the officers arrived at that address, they were met by an older, white female who was standing in the front yard of the house. The woman identified herself as the homeowner and told the officers that the house was supposed to be vacant, but that a white male had broken in. The woman said that the man had gained entry through the rear of the house. The officers walked around to the back of the house and noticed that the exterior door on the second floor was standing open.
 {¶ 3} "Upon observing the open door, the officers went upstairs `to see if anyone was inside.' Prior to entering the house, the officers asked for a Code A, which prohibited anyone else from using the radio except for them until they finished checking the house. The Code A was so that Officers Humston and Velez would not have to `worry about waiting for someone to get off of the radio if they found themselves in a dangerous situation and had to call for help.
 {¶ 4} "Having requested the Code A, Officer Humston looked into the kitchen through the open exterior door. Straight through the kitchen was a small hallway. Off the hallway was an open door leading into another room. Looking into the house through the exterior door, Officer Humston observed an `orange glow' coming from that other room. The glow was `flickering back and forth' and was very dramatic, even in the daylight. Officer Humston immediately became concerned that the glow was a fire and decided to investigate.
 {¶ 5} "With guns drawn, the officers walked through the kitchen, stepped into the hallway, and peeked into the room that Officer Humston believed was on fire. In that *Page 3 
room, Officer Humston saw several marijuana plants growing in water. There were three or four `very expensive, high-dollar looking grow lights' suspended from the ceiling by two-by-fours and framing. The walls of the room were covered from floor to ceiling with silver, reflective material that looked like aluminum foil. It was `probably the largest growing operation' that Officer Humston had seen.
 {¶ 6} "The orange glow that Officer Humston observed was actually the reflection of the grow lights off the walls. (Tr. 12) The flickering effect was caused by an oscillating fan moving back and forth in the room that made the silver, reflective material `kind of waver' on the walls. (Id.)
 {¶ 7} "Satisfied at that point that there was no fire, Officer Humston turned around and spotted a white male, later identified as McKinley, sitting in an office chair in front of a computer in another room. McKinley was wearing a shirt and pants, but his pants were down below his waist. Officer Humston asked McKinley who he was and requested him to cover up. McKinley covered up and said, `I live here. What are you doing in my home?' Officer Humston explained to McKinley that they had received a burglary-in-progress call and that the homeowner had advised them that a white male had broken into the house. Officer Humston asked McKinley if he had any proof that he lived here. McKinley provided him with a driver's license or State I.D. that identified his residence as 2908 East Third Street. Officer Humston next inquired, `So if you live here then * * * [w]hat's this?' He motioned to the room with the marijuana plants and the growing equipment. McKinley responded that it was his medicine.
 {¶ 8} "At all times during Officer Humston's conversation with McKinley, McKinley was seated in the office chair. McKinley was not handcuffed, formally arrested *Page 4 
and placed in Officer Humston's cruiser until the officers began collecting the marijuana plants and the equipment. McKinley was transported and booked into the county jail." (Citations omitted.)
 {¶ 9} In his first assignment, McKinley contends the trial court erred in overruling his motion to suppress because there were no exigent circumstances justifying the police officers' search of the residence where the evidence against him was recovered.
 {¶ 10} McKinley argues that the police entered the residence without confirming that the woman who reported the alleged burglary was the actual owner of the residence. The State argues the police could reasonably rely on the word of the woman without requiring proof of ownership and particularly since her statement that the burglar had entered the home through the back door was corroborated by their observation that the second-floor exterior door to the residence was standing open.
 {¶ 11} We agree with the State that the police acted reasonably in relying on the woman's representation. The United States Supreme Court has held that a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not. Illinois v. Rodriguez, (1990) 497 U.S. 177, 186,110 S.Ct. 2793, 111 L.Ed.2d 148. Justice Scalia wrote on behalf of the Court: "* * * [W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, *Page 5 
determination of consent to enter must `be judged against an objectivestandard: would the facts available to the officer at the moment * * *"warrant a man of reasonable caution in the belief" ` that theconsenting party had authority over the premises? If not, thenwarrantless entry without further inquiry is unlawful unless authorityactually exists. But if so, the search is valid." (Emphasis added.) Id., at 188-189.
 {¶ 12} There was nothing in the surrounding circumstances that suggested that the officers should have doubted the woman's assertions that she owned the property, that it was supposed to be vacant and that an intruder was on the premises. In short, it was objectively reasonable for the officers to rely on her permission to enter the house to capture the suspected intruder.
 {¶ 13} The Fourth Amendment to the United States Constitution protects people from "unreasonable" searches and seizures. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to only a few well recognized exceptions. Katz v. United States (1967),389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. Once such recognized exception is the exigent circumstances or "emergency" exception.Warden v. Hayden (1967), 387 U.S. 294, 298, 87 S.Ct. 1642,18 L.Ed.2d 782. Pursuant to that rule, a police officer, even absent a warrant or probable cause, may lawfully enter a structure, including a private home, when the totality of the facts and circumstances known to the officer gives rise to a reasonable belief that immediate entry is necessary to either protect that property or assist people inside who may be in danger or in need of immediate aid. Ringel, Searches and Seizures, Arrests and Confessions (2 Ed. 2003) 10-11 to 10-12, Section 10:5; Katz, Ohio Arrest, Search and Seizure (2006) 167-68, Section 9:1. *Page 6 
 {¶ 14} When police reasonably believe that a burglary is in progress or has occurred at a particular structure, an immediate warrantless entry undertaken to investigate and protect that property and assist any victims inside who may be in danger or in need of immediate aid has been upheld by the courts as a reasonable search. See LaFave, Search and Seizure (2004) 450-74, Section 6.6(a) and (b). See, also, State v.Overholser (July 25, 1997), Clark App. 96-CA-0073, 1997 WL 451473.
 {¶ 15} However, the warrantless entry and search must be limited in duration and scope to the purpose justifying that intrusion, including only that which is necessary to alleviate the emergency and the dangers associated therewith. Mincey v. Arizona (1978), 437 U.S. 385,98 S.Ct. 2408, 57 L.Ed.2d 290. During a warrantless emergency entry, police may seize contraband which is in plain view. Michigan v. Tyler (1978),436 U.S. 499, 510, 98 S.Ct. 1942, 56 L.Ed.2d 486; Thompson v. Louisiana( 1984), 469 U.S. 17, 22, 105 S.Ct. 409, 83 L.Ed.2d 246.
 {¶ 16} At the time the police officers entered the residence they had a reasonable belief, based upon the facts and circumstances, that a burglary was in progress and the burglar might still be on the premises. The marijuana and grow lights were observed in plain view by the officers while they were in a place they had a right to be. SeeCoolidge v. New Hampshire (1971), 403 U.S. 443, 91 S.Ct. 2022,29 L.Ed.2d 564. The first assignment of error is Overruled.
 {¶ 17} In his second assignment, McKinley argues the trial court erred in refusing to suppress the statements he gave to the police officers at gun point. McKinley contends his statements were not given voluntarily and were given without proper Miranda warnings. He argues he was subjected to custodial interrogation and the police *Page 7 
obtained his admission without providing Miranda warnings and securing a proper waiver of his right to remain silent and his right to counsel.
 {¶ 18} The State argues that when the police pointed their firearms at McKinley he was not under arrest but only being detained. The State notes that McKinley was not told he was under arrest, was not handcuffed, nor was he searched before he was questioned by Officer Humston. The State argues that a reasonable person in McKinley's shoes would not have believed himself in police custody. The State argues that the drawing of guns does not always signal an arrest, citing State v.Harrington (June 1, 1994), Montgomery App. No. 14146 1994 WL 285048. That statement in Harrington was dicta, however, since there was no evidence that police drew their guns before they patted Harrington down and recovered a hard cylindrical object containing drugs. It is indeed true that some courts have ruled that, under some circumstances, it is reasonable to use a drawn weapon to make an investigative stop. SeeWells v. Akron (1987), 42 Ohio App.3d 148, 150, 537 N.E.2d 229, citingUnited States v. Jackson (C.A.2, 1981), 652 F.2d 244; United States v.Bull (C.A.4, 1977), 565 F.2d 869; People v. Finlayson (1980),76 A.D.2d 670, 431 N.Y.S.2d 839.
 {¶ 19} We need not decide whether McKinley was in custody forMiranda purposes if we decide the State did not prove that McKinley voluntarily spoke to Officer Humston. A defendant's confession obtained by coercion — whether physical or mental — is forbidden. Coercive police activity is a necessary predicate to finding that a confession is not voluntary. Colorado v. Connelly (1986), 479 U.S. 157, 167,107 S.Ct. 515, 93 L.Ed.2d 473. The test for admissibility is whether the behavior of the police was such as to overbear the accused's will to resist and bring about confessions not freely *Page 8 
self-determined. State v. Johnston (1990), 64 Ohio App.3d 238,580 N.E.2d 1162. The ultimate question of the voluntariness of a confession is an issue of law, and an appellate court should review the facts to make its determination of the issue. Arizona v. Fulminante (1991),499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302. Upon the undisputed facts before us, the State failed to prove that McKinley's admissions to the police while they had a gun drawn on him were voluntarily made. The trial court erred in overruling McKinley's motion to suppress those admissions. The second assignment is sustained.
 {¶ 20} The judgment of the trial court is Reversed and Remanded for further proceedings.
GRADY and WALTERS, JJ., concur.
(Hon. Sumner E. Walters, retired from the Third Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio) *Page 1