OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Andre Pounds, filed October 30, 2007. On February 16, 2007, Pounds was indicted on one count of domestic violence (prior conviction), in violation of R.C. 2919.25(A), one count of murder (purposeful), in violation of R.C. 2903.02(A), with a firearm specification and a discharging a firearm from a *Page 2 
motor vehicle specification, one count of murder (proximate result), in violation of R.C. 2903.02(B), with a firearm specification and a discharging a firearm from a motor vehicle specification, one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), one count of possession of cocaine ( 5grams), in violation of R.C. 2925.11(A), and three counts of having weapons while under disability, in violation of R.C. 2923.13(A)(3). On February 22, 2007, Pounds pled not guilty. Pounds filed a motion to suppress on March 6, 2007, which the trial court overruled in part and sustained in part on July 5, 2007, following a hearing.
 {¶ 2} On September 18, 2007, Pounds pled guilty to domestic violence (prior conviction), a felony of the fourth degree. Pounds waived his right to a trial by jury on the charges of having weapons while under disability, and on September 21, 2007, Pounds was convicted, following a bench trial, of three counts of having weapons while under disability. Following a jury trial on the remaining charges, Pounds was found guilty of purposeful murder, with a firearm specification, and proximate result murder, with a firearm specification, tampering with evidence, and possession of cocaine (5 grams). The trial court merged the murder and having weapons while under disability convictions and sentenced Pounds as follows: 18 months for domestic violence, fifteen years to life for murder, with a three year firearm specification, five years for tampering with evidence, six months for possession of cocaine, and five years for having weapons while under disability. The sentences were ordered to be served consecutively, with the three year term on the firearm specification to be served prior to the other terms, for a total sentence of 30 years to life, to be served consecutively to a twelve month term imposed in Case No. 2006 CR 1168.
 {¶ 3} On September 21, 2006, Kent Wilkinson, a truck driver employed by Stahler *Page 3 
Trucking and Leasing, was driving down South Broadway Street in the City of Dayton, when he observed the body of 29 year old Summer Francis, the victim herein, on the floor of an open industrial garage at 1640 South Broadway. Francis was on her back with her arms straight out and her shirt pulled over her face, and she was naked from the waist down. Wilkinson proceeded to his place of employment and called 911 to report what he had seen, and he later proceeded to the garage with police officers to show them Francis' body.
 {¶ 4} Edward Zawodniak, an evidence technician for the Crime Scenes Investigation Unit of the Dayton Police Department, testified that he responded to the scene and observed tire marks along the side of the road by the garage, indicating that someone had stopped a vehicle there, and he also observed drag marks leading from a blood smear near the tire marks all the way to Francis' body. There were no signs of trauma to Francis' lower body, but Zawodniak observed a bullet hole in her left cheek and an exit wound around her right ear.
 {¶ 5} Lee Lehman, Deputy Coroner and Forensic Pathologist, performed an autopsy on Francis' body. According to Lehman, the gun used to kill Francis was approximately two to three inches from her face when she was shot. Lehman observed an older, yellowish bruise on Francis' lip. Lehman also observed multiple bruises on the back of Francis' right forearm, legs and knees that were inflicted prior to her death. Lehman testified that the bullet did not strike Francis' brain, and that her death was therefore not instantaneous but "could take as long as an hour for the brain to swell and bleeding around * * * the brain from the broken skull and that to kill her." A pelvic examination revealed no signs of trauma. Francis had Xanax in her system, and her blood alcohol content was .21 gram percent. Lehman estimated that Francis died at approximately 3:30 a.m. According to Lehman, Francis was alive when she was shot. *Page 4 
 {¶ 6} Dawnielle Mack testified that she had known Francis for 15 years, and that she and Francis worked together as dancers at the Gemini Lounge. Mack referred to Francis as her "cousin," and her "aunt," although she testified that Francis "was no blood relation." Francis had a three year old daughter with Pounds, with whom she lived in Riverside, Ohio, along with Francis' 10 year old son. According to Mack, on Sunday, September 17, 2006, she called Pounds to speak to Francis when she was unable to reach Francis on Francis' phone. Mack testified, an angry Pounds "said that he just beat up Summer, that she was trying to steal money out of his car, and that I need to go get my aunt because he whooped her ass, and that he thought that she was trying to rob him."
 {¶ 7} Mack went immediately to Francis' apartment, and Francis told her that "Dre beat her up." According to Mack, "Her mouth was busted really bad. It was swollen out really far, and her nose was bleeding. And, she had bruises on her, and she had a * * * nice bruise on her side and she was crying and she was hysterical." Later, Pounds returned to the apartment and Mack testified he said to Francis, "you deserved that. You deserve worse, actually. He was like, if I would have had my gun, I would have shot you in your head on the spot."
 {¶ 8} Mack testified that Francis returned to work on September 20, 2006, after the swelling in her lip receded somewhat, and that she and Francis both were scheduled to work from 11:00 a.m. until 6:00 p.m. that day. At the end of their shift, the women went to "Tel's dad's house," where they met Tel, his dad, and someone named Shawn. According to Mack, "We was hanging out drinking and stuff, partying." Mack "passed out," and the others went to a bar called Frank's.
 {¶ 9} Mack woke up around 8:00 p.m. and joined Francis, Tel, Shawn and someone *Page 5 
named Rick at Frank's. Mack testified that Francis was drinking beer and shots of Gray Goose vodka. Mack and Francis remained at Frank's until it closed, at 2:30 a.m., and then they returned to Francis' apartment. According to Mack, Pounds was awake when they arrived, and he and Francis began to argue. Pounds then left the apartment, stating that he was leaving Francis. Francis followed Pounds outside, and Mack observed Pounds get into his burgundy Buick, and she observed Francis get into the passenger side. From her vantage point in the apartment, Mack could only see the tops of their heads as they entered the car. Pounds drove away from the apartment building, and Mack estimated it was between 3:00 and 3:15 in the morning. Mack then went to sleep.
 {¶ 10} Mack was later awakened by Francis' 10 year old son eating cereal. He told Mack to tell Francis that he loved her and would see her after school. Mack went back to sleep, waking up again around 9:00 a.m. Mack believed Francis was in the apartment and went back to her bedroom to see if she was awake. Upon entering Francis' bedroom, Mack noted, "her side of the bed was still made." Mack knocked on the bathroom door and found Pounds inside helping his daughter.
 {¶ 11} Mack asked Pounds where Francis was, and he told her that she had jumped out of the car on Broadway. When asked what part of Broadway, Pounds said, "just Broadway." Pounds then told Mack that Francis jumped out "in front of Church's on Broadway, and that she just walked off. And he circled the block one time and didn't see her." Finally, when Mack told Pounds she did not believe him, Pounds told Mack, "they was out in front of [Pound's brother's house] off of Broadway and he went in, and when he came out she was gone, and he drove around the block one time and then came home." Mack searched for Francis "up and down *Page 6 
that street so many times and nobody had seen her." Mack called hospitals and the jail, thinking Francis had perhaps been arrested "on a public intox," and she attempted to file a missing person report with Riverside Police.
 {¶ 12} Mack found Francis' cell phone and called her contacts, and no one had seen Francis. Mack noted that no one had called Francis, including Pounds. Mack later learned that Francis was dead from one of Francis' sisters.
 {¶ 13} On September 22, 2006, Mack returned to Francis' apartment to retrieve Mack's belongings there. After being let into the apartment by a staff person, Mack noticed that the boots Francis had been wearing when she left with Pounds were in her bedroom. According to Mack, "[h]er house was tore up and I went to throw some papers that was laying on the floor away, all of [Francis' daughter's] clothes was in a plastic bag in the pantry with her social security card and her birth certificate."
 {¶ 14} Mack testified that she knew Pounds to carry a handgun, and that he kept it in his car under the driver's seat. An empty handgun holster, a substantial amount of blood, cleaning supplies and rags, and some cocaine and marijuana were later found in Pounds' vehicle after it was impounded. Steven Weichman, a forensic scientist assigned to the DNA serology section of the Miami Valley Regional Crime Lab, tested the blood found in the car and determined that it belonged to Francis. The gun used to shoot Francis and the bullet that killed her were not found.
 {¶ 15} After being handcuffed and transported to the Safety Building in downtown Dayton, Pounds was interviewed in two sessions by police officers. At the hearing on the motion to suppress, City of Dayton police officer Detective Michael Galbraith and Officer Gerald Humston testified regarding the interview process. Humston transported Pounds to the *Page 7 
Safety Building and stood outside the door of the interview room. Galbraith, who was interviewing another witness in the case, was interrupted and asked by Detective Daniel Hall to assist in interviewing Pounds. Galbraith did not know if Pounds was under arrest or free to leave, and he did not have any knowledge as to whether or not Pounds was a suspect. Pounds was not initially read his rights. Galbraith got him a bottle of water and then the interview began, lasting approximately 15 minutes. Hall initially asked preliminary questions while Galbraith took notes. Galbraith did not ask Pounds any questions. Hall asked Pounds when he had last seen Francis, and Pounds indicated that Francis returned home at 3:00 a.m. after she had been out drinking with Mack. Pounds stated that he and Francis then went to get something to eat. According to Pounds, he and Francis then went to a home on the west side, and Francis remained in the car while Pounds went inside. Pounds stated that, when he returned to the car, Francis was gone. Galbraith testified that Pounds seemed coherent, he was never touched or handcuffed, and when the initial questioning ended, Galbraith assumed that Pounds was free to go. Galbraith stated that the presence of an armed guard (Humston) outside the interview room was standard procedure, even in non-custodial interviews, to keep witnesses, suspects and victims from crossing paths during interviews.
 {¶ 16} After Galbraith and Hall left the interview room, Galbraith and Detective Chris Bean interviewed other witnesses. Galbraith returned to Pounds an hour later, accompanied by Bean, after consulting with Bean and Hall. At that point, the officers had identified Pounds as a suspect. Pounds was Mirandized by means of the standard Pre-Interview Form, which Pounds initialed and signed and which was admitted at the hearing. During this second session, which lasted about 30 minutes, Pounds was asked if he owned a car and he indicated he owned a red *Page 8 
Buick Regal. He was also asked about another vehicle confiscated by police as a result of a drug offense. Pounds indicated he went by the nickname of Dre. Pounds stated he was angry at Francis for coming home so late, but that they did not fight. Pounds was asked whether the officers would find blood in Pounds' vehicle, and Pounds indicated that Francis had recently had a "partial hysterectomy" and bled heavily on the floorboard and seat of the car on the way home from the hospital. Pounds was evasive as to the date of alleged surgery. He told the officers that he had cleaned the car that very day at a car wash. Pounds stated that he had also gone to the home of his brother, Doug Pounds, on the Westside, to package marijuana to sell. When asked how the officers could contact Doug, Pounds indicated his brother had turned himself in and been sentenced to prison. When the officers asked Pounds "who would shoot and dump Summer like that," Pounds immediately asked for a lawyer, the interview was concluded, and Pounds was placed under arrest for the murder of Francis and taken to jail.
 {¶ 17} Pounds asserts three assignments of error. His first assignment of error is as follows:
 {¶ 18} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY OVERRULING APPELLANT'S MOTION TO SUPPRESS STATEMENTS ILLEGALLY OBTAINED WHEN POLICE SUBVERTED APPELLANT'S RIGHT TO MIRANDA WARNINGS BY CUSTODIALLY INTERROGATING HIM WITHOUT MIRANDA WARNINGS AND THEN DEVELOPING ANSWERS THEREAFTER."
 {¶ 19} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations *Page 9 
omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." State v. Purser, Greene App. No. 2006 CA 14,2007-Ohio-190, ¶ 11.
 {¶ 20} "`In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment * * * commanding that no person "shall be compelled in any criminal case to a witness against himself.'" Missouri v. Seibert
(2004), 542 U.S. 600, 607, 124 S.Ct. 2601, 159 L.Ed.2d 643."Miranda addressed `interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice' about speaking, 384 U.S., at 464-465, 86 S.Ct. 1602, and held that a suspect must be `adequately and effectively' advised of the choice the Constitution guarantees. (Internal citation omitted). The object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed. * * *
 {¶ 21} "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function `effectively' asMiranda requires." Id., at 611.
 {¶ 22} In ruling on Pounds' motion to suppress, the trial court noted, "By *Page 10 
stipulation of the parties through their pleadings, it is uncontested that the initial interview of the Defendant in the detective section on the date in question was custodial, that Miranda warnings ought to have been given in advance of that, * * * ." The court suppressed Pounds' statements in the initial interview with Galbraith.
 {¶ 23} In reliance upon Seibert, the trial court determined, "The inquiry in a `question first warn later' case is * * * not whether the Defendant realized that his statements may be inculpatory, but simply `whether the warnings reasonably conveyed to a suspect his rights as required by Miranda.'
 {¶ 24} "Thus, the Court in this case need not consider all the surrounding circumstances to make what is of necessity a subjective determination: whether the warnings given `reasonably conveyed'Miranda rights * * * ." The trial court found that the warnings were adequate and did not suppress Pounds' statements in the second interview session.
 {¶ 25} Finally, the trial court determined the suppressed statements were not utilized in the affidavits provided in support of the search warrants, so that any evidence obtained pursuant to the warrants was admissible.
 {¶ 26} Pounds relies upon Seibert and argues that he was in custody, that he felt that he had incriminated himself in the initial interview by stating that he was angry at Francis for coming home late and that she was in his car before the shooting, and that the Miranda warnings he received were ineffective, since "the second interrogation expanded on the previously given statements." According to Pounds, he "faced unbroken `continuity' in police questioning." Pounds concludes, "police did undermine these warnings and * * * the trial court committed reversible error in failing to suppress *Page 11 
the use of any of the information ensuing from both interrogations."
 {¶ 27} As the State acknowledges, the trial court correctly suppressed the statements Pounds made during the initial interview since he was not initially Mirandized and because the evidence made clear that Pounds was not free to leave. We must, however, determine if the second interview was a continuation of the first and if the subsequent warnings were effective.
 {¶ 28} In Seibert, an interrogating officer deliberately withheldMiranda warnings from a suspect following her arrest, squeezing her arm and questioning her for 30 to 40 minutes. After Seibert confessed, she was given a 20 minute break before she was Mirandized. Seibert waived her rights and the officer resumed questioning, initiating the second interview as follows: "* * * we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" The officer then confronted Seibert with her prewarning statements, getting her to repeat her confession. The Supreme Court determined, since the interview process was nearly continuous, the postwarning statements were the product of the invalid initial statement and should be suppressed. Factors significant to the Court were "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id., at 615.
 {¶ 29} In distinguishing Seibert from Oregon v. Elstad (1985),470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, the Court noted, the "unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and *Page 12 
managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the Miranda warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. * * * Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way [the officer] set the scene by saying `we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?' * * * It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." Id., at 616.
 {¶ 30} The facts in Seibert are clearly distinguishable from the matter herein. Pounds was subjected to separate interrogations, albeit in the same location, first by Hall, and then, an hour later, by Galbraith and Bean. At the time of the initial interview, several witnesses were being questioned in general, and Galbraith did not know if Pounds was a suspect. There was no demonstrated planned or deliberate effort by the officers to obtain a confession absent Miranda warnings, and then have Pounds waive his rights and repeat his confession, the purpose being to obtain a confession that Pounds would not otherwise make if he understood his rights at the outset. While *Page 13 
Pounds believes he incriminated himself initially, at no point did he confess to the murder of Francis. At the time of the second interrogation, the officers had gained more information from subsequent interviews of other witnesses, and they immediately advised Pounds of his rights, having identified him as a suspect. Galbraith did not imply that the second interview was merely a continuum of the first, as did the officer in Seibert. See State v. Baccus, Montgomery App; No. 21025,2006-Ohio-771. As the State asserts, "by never confessing to the murder and by asking to speak with an attorney, Pounds demonstrated that he understood his rights, and by exercising them, he demonstrated that they were adequate and effective."
 {¶ 31} Finally, the State never utilized any statements that Pounds made during either interview as evidence at trial. In other words, even if the trial court erred in overruling Pounds' motion to suppress the statements from the second interview, which it did not, that error would be harmless, since the statements were not offered in evidence. Pounds' first assignment of error is overruled.
 {¶ 32} Pounds' second assignment of error is as follows:
 {¶ 33} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ENTERING A FINDING OF GUILTY WHICH FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 34} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be *Page 14 
reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997, 2006-Ohio-3367.
 {¶ 35} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. State v.DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 36} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 37} According to Pounds, all the evidence against him is circumstantial, Mack is not a credible witness, and there is no evidence that Pounds intended to kill Francis.
 {¶ 38} First, "[i]t is well-established that both circumstantial and direct evidence have the same probative value, and in some instances, certain facts can be established only by circumstantial evidence.State v. McKnight, 107 Ohio St.3d 101, *Page 15 2005-Ohio-6046, ¶ 75 (Internal citation omitted). `[Circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.' McKnight. A conviction based on purely circumstantial evidence is no less sound than a conviction based on direct evidence." State v.Howland, Fayette App. No. 2006-08-035, 2008-Ohio-521.
 {¶ 39} Having reviewed the entire record, weighed all of the evidence and all the reasonable inferences, and considered the credibility of the witnesses, we cannot conclude that the jury lost its way and created a manifest injustice requiring a new trial. While Mack could only see the tops of Pounds' and Francis' heads as they got into Pounds' car, she clearly saw them leave together in Pounds' red Buick. Deferring to the jury's ability to assess the credibility of Mack, whom the jury clearly believed, Francis was with Pounds in his car one half hour before her estimated time of death. Pounds was known to keep a gun in his car, and an empty holster was found in the backseat. The passenger area of Pounds' car was saturated with Francis' blood, and her autopsy revealed no other wounds or abrasions in addition to the gunshot wound that would have resulted in such a substantial loss of blood. The two to three inch distance between the gun and Francis' face when she was shot is consistent with being shot at close range within Pounds' car.
 {¶ 40} Pounds attempted to clean his car the day Francis was shot. Mack testified that Francis left the apartment wearing a pair of boots that were later discovered in Pounds' apartment. Contrary to Pounds' assertion regarding his lack of intent to kill Francis, he told Francis that he would have shot her in the head on the spot if he had his gun just days earlier. The older bruising on Francis' body was *Page 16 
consistent with Mack's statements regarding Francis' earlier beating. That Mack found Pounds' daughter's belongings, along with her social security card and birth certificate packed up suggests that Pounds intended to flee with his daughter. Since Pounds' conviction is not against the manifest weight of the evidence, his second assignment of error is overruled.
 {¶ 41} Pounds' third assignment of error is as follows:
 {¶ 42} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN OVERRULING APPELLANT'S MOTION FOR DISMISSAL PER RULE 29 OF THE OHIO RULES OF CRIMINAL PROCEDURE OF THE CHARGE OF TAMPERING WITH EVIDENCE SINCE THE STATE FAILED TO MEET ITS BURDEN OF PROOF HEREIN."
 {¶ 43} "When considering a Crim. R. 29 motion for acquittal, the trial court must construe the evidence in a light most favorable to the state, and determine whether reasonable minds could reach different conclusions on whether the evidence proves each element of the offense charged, beyond a reasonable doubt. (Internal citation omitted). The motion will be granted only when reasonable minds could only conclude that the evidence fails to prove one or more of the essential elements of the offense. (Internal citation omitted).
 {¶ 44} "A Crim. R. 29 motion challenges the legal sufficiency of the evidence. A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. (Internal citation omitted). On review of a trial court's denial of a Crim. R. 29 motion, the proper test to apply is the one set forth in *Page 17 
paragraph two of the Syllabus of State v. Jenks (1991),61 Ohio St.3d 259:
 {¶ 45} "`An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. Bragg, Montgomery App. No. 22416, 2008-Ohio-4919, ¶ 8-10.
 {¶ 46} R.C. 2921.12(A)(1) provides, "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."
 {¶ 47} Pounds argues, even if he did shoot and kill Francis, "and if he did place her dead body on a warehouse floor, with a door wide open, he would not be `concealing' evidence. Rather, he would be bringing forth or presenting the corpus delecti for immediate detection. While some constrained interpretation of this statute might deem cleaning or washing a car as tampering with evidence, that is not the theory presented by the State, only the placing of the dead body in an open warehouse was asserted as tampering with the evidence."
 {¶ 48} The indictment herein provides, in Count Four, that Pounds "* * * did alter, destroy, conceal, or remove any record, document or thing, * * * ." As the State asserts, Pounds' suggestion that he did not alter the evidence is baseless. Having *Page 18 
examined the evidence admitted at trial, we conclude that, if believed, the evidence would convince the average mind of Pounds' guilt of tampering with evidence beyond a reasonable doubt. Pounds removed part of Francis' clothing and dragged her body into an industrial garage, where he dumped her. Further, he attempted to remove her blood from his vehicle. Zawodniak testified that the vehicle had just been cleaned and detailed, and he stated, "You could smell the detailing in the processing of the vehicle." Weichman testified that cleaners can destroy or dilute DNA, and the State correctly asserts that "Pounds is wrong in his assertion that his conviction on tampering for the act of cleaning Summer's blood off his car is supported by a constrained interpretation of the statute." Pounds also disposed of the gun he used to kill Francis. Since any rational juror could have found the essential elements of tampering with the evidence proven beyond a reasonable doubt, Pounds' third assignment of error is overruled, and the judgment of the trial court is affirmed.
 WOLFF, P.J. and FAIN, J., concur. *Page 1