OPINION
{¶ 1} Defendant-appellant, Kimberly Prater, appeals from her conviction for Possession of Marijuana, Possession of OxyContin and Weapons Under Disability.[1] *Page 2 
Prater contends that the trial court erred by denying her motion to suppress evidence. She further contends that she was deprived of her constitutional right to a fair trial and to effective assistance of counsel.
 {¶ 2} We conclude that the evidence supports the trial court's decision to overrule Prater's motion to suppress. Further, we conclude that the record does not support her claim of ineffective assistance of counsel or her claim that she was deprived of a fair trial. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 3} On April 19, 2005, the Springfield Police Department Narcotics Unit was conducting surveillance on Prater's residence when Detective Gerald Woodruff observed a yellow pickup truck pull up approximately two doors down from Prater's residence. The male occupant of the vehicle, later identified as Jerry Caffee, exited the truck and entered Prater's home. Caffee did not have anything in his hands when he entered the home. While Caffee was in the house, the detectives ran a check on the registration on his truck. They learned that the registration was for a 1992 Plymouth and that the registered owner was under a license suspension. Approximately fifteen minutes later, Caffee was observed exiting the residence carrying a "white rolled-up item in his hands." Caffee returned to his truck and drove off. Thereafter, Woodruff followed and initiated a traffic stop once the truck was "out of that area [,] about two minutes away from [Prater's address]."
 {¶ 4} According to Woodruff, Caffee pulled over into a driveway and exited his vehicle. Woodruff approached and advised Caffee of the reason for the stop. Caffee *Page 3 
stated that he had been "dropped off by a friend several minutes ago over on Madison Avenue to pick up the truck that he was driving because it was overheating." Woodruff informed Caffee that he knew this information was false. Woodruff testified that Caffee appeared very nervous, and that his hands were shaking. Thereafter, it was determined that Caffee was driving under a suspended license. Caffee also informed the detective that he had Oxycontin and Percocet in his pockets. The detective approached the truck and detected a "strong odor of marijuana." He also observed a "plastic rolled-up white baggy like a grocery sack" on the front seat of the truck. It was determined that the bag contained approximately one-quarter pound of marijuana. Caffee informed the officers that he came out of the residence with the bag.
 {¶ 5} Woodruff was then informed by the detectives who remained at Prater's location that Prater's daughter was moving large trash bags from the home to two different vehicles. According to the police, the bags were the type of bags that they had, in their experience, seen used to package large amounts of marijuana. Therefore, the officers feared that contraband was being removed from the residence. Woodruff then went to obtain a search warrant for Prater's home, and told the other detectives to "freeze" the residence.
 {¶ 6} Detective Eugene Bell and Officer Louis knocked on the front door of Prater's residence. Bell and Louis were admitted into the residence at which time they advised Prater of their intent to freeze the home. Prater was with her daughter and her then boyfriend, Jesse Napier. Officer Louis remained inside the home observing the occupants while Detective Bell remained on the porch. The front door remained open so that Bell could see the occupants. *Page 4 
 {¶ 7} Woodruff returned to the scene with a search warrant, and the officers proceeded to conduct a search during which they found bundles of marijuana, some of which were packaged in large trash bags. Prater was indicted on one count of Possession of Marijuana exceeding 20,000 grams in violation of R.C. 2925.11, one count of Possession of OxyContin in an amount exceeding five times the bulk amount but less than fifty times the bulk amount, in violation of R.C. 2925.11, and one count of Having Weapons Under Disability, in violation of R.C. 2923.13. Napier was charged as a co-defendant.
 {¶ 8} Prater was represented by attorney James Skogstrom. Napier hired attorney Gregory Lind to represent him. At some point, Lind allegedly informed Napier that "for 16,000 cash, he could make [Napier's case] disappear." Lind allegedly told Napier that he would work it out with a prosecutor who was a "buddy" with whom he often went fishing. Thereafter, the Grand Jury indicted Prater, but failed to indict Napier. Prater was appropriately arraigned.
 {¶ 9} On August 26, 2005, Prater filed a motion to suppress evidence based upon the claim that police improperly entered her home without a warrant, and that the subsequently obtained warrant was not based upon probable cause.
 {¶ 10} Thereafter, Lind allegedly informed Napier that he could get Prater's case dismissed for a payment of $40,000. At least one of Lind's conversations in this regard was recorded. Shortly before the hearing on the motion to suppress, Prater informed Skogstrom of Lind's alleged statements. Skogstrom was "startled," and he and Prater discussed "a number of possible ways [they] might deal with that, and [they] decided that [they would] think about it a little bit and try to make some decisions." A couple of *Page 5 
days later, Prater called Skogstrom informing him that she and Napier were "leaving the office of the FBI." Skogstrom instructed them to come to his office.
 {¶ 11} A meeting was held at Skogstrom's office with Prater, Napier, Woodruff, Bell and Sergeant Turner. During that meeting, there was discussion about placing a wire on Napier and allowing him to meet with Lind to make a payment with marked money. According to Skogstrom, they also discussed "the fact that having come forth with this information that [it was] hoped [the police] would factor [Prater and Napier's cooperation] into whatever subsequent [plea] negotiations [were held on behalf of Prater]." According to Napier, a promise was made that if he cooperated with regard to any investigation, Prater would get immunity from prosecution. Woodruff testified that even though he informed Prater and Napier that he "would see what he could do" with regard to the charges against Prater, no promises were made.
 {¶ 12} Napier was wired and also given a cassette recorder. He then delivered $1,000 to Lind who allegedly stated that "it would be 39,000 more that [Napier] would owe him and [Prater's] case would be taken care of." Lind also allegedly told Napier that he was "going on a fishing trip that weekend with the prosecutor and he would let [Napier] know as soon as he got back."
 {¶ 13} According to Skogstrom, he was kept informed of the investigation over the course of the next few days. He also informed Prater that she "might end up with another lawyer," because he was not going to be able to continue representing her. According to Napier, Skogstrom indicated that he and Lind were friends, and that Skogstrom could not participate in something that would ruin Lind's reputation. At some point, Skogstrom informed Lind that he was being investigated. *Page 6 
 {¶ 14} Prater filed a motion to substitute Ronald Keller as her attorney. Counsel filed a motion to dismiss the case based upon the claim that Skogstram's actions prejudiced Prater. Hearings were held on the motion to dismiss and the motion to suppress, both of which were overruled by the trial court.
 {¶ 15} Thereafter, Prater entered a plea of no contest and was sentenced to an aggregate prison term of twelve years. Prater filed an appeal. Appointed counsel filed a brief on behalf of Prater under the authority of Anders v. California (1967), 386 U.S. 738, which required this court to conduct an independent review of the record to determine the existence of any potential assignments of error having arguable merit. Following our review, this court issued a decision and entry in which we determined that there existed arguable merit to the issue of whether Prater's trial counsel was ineffective. Substitute appellate counsel was appointed, and a brief was filed on behalf of Prater raising the three assignments of error set forth below.
 II {¶ 16} Prater's First Assignment of Error states as follows:
 {¶ 17} "THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS."
 {¶ 18} Prater contends that her motion to suppress evidence was improperly overruled by the trial court. In support, she argues that her rights were violated when the police entered her home without a warrant. She further argues that the warrant subsequently obtained by the police was deficient because there was no probable cause for issuing a warrant and because information on the affidavit for the warrant was stale *Page 7 
and unreliable.
 {¶ 19} "The Fourth Amendment protects individuals from an unreasonable search in their homes. [Internal citations omitted]. *** Police may not enter one's home to perform a search or to seize items without a warrant, absent consent or exigent circumstances. [Internal citation omitted]." State v. Keith, Montgomery App. No. 22354, 2008-Ohio-4326, ¶ 17.
 {¶ 20} Probable cause for a search warrant exists when a reasonably prudent person would believe that there is a fair probability that the place to be searched contains evidence of a crime. Illinois v.Gates (1983), 462 U.S. 213, 238-239. When "reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by [a judge or] magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the judge or magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant." State v. George, 45 Ohio St.3d 325, 544. "The reviewing court's duty is merely to ensure that the issuing magistrate or judge had a substantial basis for concluding that probable cause existed." State v. Cabrales, Hamilton App. No. C-050682, 2007-Ohio-857, ¶ 21, citing State v. George (1989), 45 Ohio St.3d 325. "This standard of review grants a great deal of deference to the issuing magistrate." Id., citing State v. Klein (1991), 73 Ohio App.3d 486.
 {¶ 21} "The exigent or emergency circumstances exception justifies a warrantless entry in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when someone inside poses a danger to *Page 8 
the police officer's safety." State v. Sharpe, 174 Ohio App.3d 498,511-512, 2008-Ohio-267, ¶ 48, citations omitted. "The key issue is whether the officers `had reasonable grounds to believe that some kind of emergency existed * * *. The officer must be able to point to specific and articulable facts, which, taken with rational inferences from those facts, reasonably warrant intrusion into protected areas.'"State v. White, 175 Ohio App.3d 302, 311, 2008-Ohio 657, ¶ 17. "The warrantless entry and search must be limited in duration and scope to the purpose justifying that intrusion, including only that which is necessary to alleviate the emergency and the dangers associated therewith." State v. McKinley, Montgomery App. No. 21668,2007-Ohio-3705, ¶ 15.
 {¶ 22} Following the suppression hearing in this case, the trial court found that exigent circumstances existed justifying the "freeze" on the house. This determination was based upon Caffee's detention and admission that he got the bag, which was found to contain marijuana, from Prater's residence, as well as the fact that bags were being removed from the house and the officers' experience showed that "marijuana in large quantities is moved about in large plastic bags." The trial court further found that there was sufficient evidence of probable cause to believe that Prater had marijuana in her house, regardless of any claimed staleness, or omission, of the information set forth in Woodruff's affidavit in support of the warrant.
 {¶ 23} When reviewing suppression issues "appellate courts give great deference to the factual findings of the trier of facts. [Internal citations omitted]. At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. [Internal citations omitted]. The trial court is in the best position to resolve questions of fact and evaluate witness credibility. [Internal *Page 9 
citations omitted]. In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. [Internal citations omitted]. An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. [Internal citations omitted]." State v. Pounds, Montgomery App. No. 22469, 2008-Ohio-5384, ¶ 19, quoting State v. Purser, Greene App. No. 2006 CA 14, 2007-Ohio-190, ¶ 11.
 {¶ 24} Our review of the record shows that the police had been investigating Prater since 2003, based upon tips from informants that Prater was dealing marijuana. Prater had previously been convicted of Trafficking Drugs. In June of 2004, Prater reported a burglary at her residence during which a "large locked safe" was taken from her home. The police recovered the safe, and returned it to Prater. Prater acted nervous and did not want to open the safe to inventory the contents in the presence of the police. The suspects arrested for the burglary informed the police that they stole the safe in order to get large amounts of marijuana from the safe.
 {¶ 25} In 2005, the police conducted a "trash pull" from Prater's outdoor trash bin during which they found one gram of marijuana, a large bag with marijuana residue, and four home drug testing kits. Later, while conducting surveillance on the home, police apprehended Caffee, who admitted that he came from Prater's residence with a bag that was found to contain marijuana. The police who remained on surveillance observed that large bags, of the type commonly used to transport marijuana, were being removed from the home and placed in two different vehicles. The police were also aware that a *Page 10 
friend of Caffee's, who observed Caffee's detention and the discovery of the marijuana in his truck, immediately placed a phone call from his cell phone. The police worried that the call was made to alert Prater to Caffee's arrest and the discovery of the marijuana. Thus, the police entered the house and informed the occupants that they were freezing the home while a search warrant was obtained. The search was executed approximately one hour later after Woodruff returned to his station, typed up the warrant information, and presented the information to a judge. No search was conducted, and no evidence was discovered until after the execution of the search warrant.
 {¶ 26} Given the evidence in this case, we conclude that the record supports a finding that a reasonably prudent person could believe that there was a probability that Prater had marijuana in her residence. Therefore, the trial court did not err in determining that there was probable cause to issue the search warrant. Furthermore, the record supports the conclusion that the officers had reasonable grounds to believe that contraband was being removed from the home, and that contraband might be destroyed prior to the execution of a warrant. We cannot say that the duration of the action of the police freezing the status quo was excessive or that it went beyond its purpose, which was to stop the destruction or removal of any contraband. Additionally, there is no claim and no evidence that the police conducted a search prior to the arrival of the search warrant. Therefore, we conclude that the trial court did not err in denying the motion to suppress on this basis.
 {¶ 27} Prater's First Assignment of Error is overruled.
 III *Page 11 {¶ 28} Prater's Second Assignment of Error provides:
 {¶ 29} "APPELLANT WAS DEPRIVED OF HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 30} Prater's claim that she was denied the effective assistance of counsel hinges upon her claim that Skogstram's actions effectively ended the investigation of Lind and thereby destroyed any opportunity to use the investigation as leverage to obtain favorable consideration in her criminal case.
 {¶ 31} Ineffective assistance of counsel claims are evaluated under the two-prong analysis set forth in Strickland v. Washington (1984),466 U.S. 668. To reverse a conviction based on ineffective assistance of counsel, an appellant first must demonstrate that his counsel's conduct was deficient in that it fell below an objective standard of reasonableness. When considering this issue, trial counsel is entitled to a strong presumption that his conduct falls within the wide range of reasonable assistance. Id. at 690. The second prong ofStrickland requires a showing that counsel's errors were serious enough to create a reasonable probability that, but for the errors, the result of the proceeding would have been different. Id. at 687.
 {¶ 32} As previously stated, Prater filed a motion to dismiss the action against her based upon this claim. At the hearing on the motion, the evidence established that Skogstrom intended to inform Lind that the investigation was being conducted. However, it is not clear whether Skogstrom spoke to Lind before or after the investigation was over. Indeed, following the hearing, the trial court found that the testimony was "hazy" with regard to whether Skogstrom revealed the investigation to Lind before the investigation was concluded, thereby effectively ending the investigation, *Page 12 
or whether the police had already decided to halt the investigation at the point Skogstrom spoke to Lind. The trial court further found that the evidence did not support a finding that Skogstrom had "affected Prater's position in this case."
 {¶ 33} From our review of the record, we conclude that there is evidence that the investigation was over before Skogstrom revealed the investigation to Lind. There is evidence that the prosecutor and police had indicated to Skogstrom that the investigation had "gone probably as far as [it was] gonna [sic] go." There is further evidence that the police informed Skogstrom that they would not pursue the case any further because they did not intend to provide Napier with the additional $39,000 allegedly requested by Lind, due to concern that the money could not be recovered. The police indicated that they were not even sure that a criminal violation had occurred or whether Lind had merely committed an ethical violation. Additionally, the evidence demonstrates that the police were aware that Skogstrom and Lind were scheduled to go on a hunting trip together. And although the police suggested that Skogstrom could make up a reason why he could not go with Lind, the evidence shows that Skogstrom informed the authorities that he was not comfortable with that idea and that Skogstrom believed he should tell Lind he could not go on the trip while the investigation was pending. There is no evidence the police ever told Skogstrom he could not, or should not, reveal the investigation to Lind. Furthermore, the record reveals that prior to Skogstrom's conversation with Lind, the police already had possession of recorded conversations wherein Lind allegedly indicated that he could take care of Napier's case, as well as a recording wherein Lind allegedly informed Napier that he could make Prater's case disappear for $39,000 more dollars. *Page 13 
 {¶ 34} The record also shows that following her initial discussion with Skogstrom regarding Lind's alleged statements, Prater proceeded to go to the meeting with the F.B.I. without informing Skogstrom or having him present during the meeting. Upon learning that Prater had gone to the FBI, Skogstrom concluded that she had lost any leverage that might help him negotiate a favorable deal for her. However, Skogstrom still attempted to get the police to make a favorable recommendation to the court and prosecutor, based upon Prater's willingness to come forward with information about Lind. Based upon the foregoing, we conclude that the trial court did not err in finding that Prater failed to establish that Skogstrom's representation was deficient.
 {¶ 35} Finally, even if we were to conclude that counsel's actions rendered his representation deficient, we would find no prejudice. There is no evidence that the State was ever willing to dismiss all charges against Prater. This is corroborated by the fact that the police were not even certain that Lind had committed a criminal violation. We further note that the trial judge who denied Prater's motion to dismiss is the same trial judge who sentenced her, so that he was in the best possible position to determine whether Skogstrom's alleged ineffective representation deprived Prater of an opportunity for favorable consideration in sentencing, based on her continuing co-operation with the investigation of Lind.
 {¶ 36} Count I of the indictment, Possession of Marijuana, carried an eight-year mandatory prison sentence. Prior to the suppression hearing, the State offered a plea agreement whereby it would dismiss Counts II and III of the indictment; in return, Prater would plead guilty to Count I and serve eight years in prison. Transcript of Proceedings of Pretrial, September 13, 2005, at pp. 2-3. Prater did not accept that deal. *Page 14 
Subsequently, at the time of the hearing on the motion to dismiss the State had offered a plea deal in which Prater would serve a total of five years imprisonment. Prater also rejected that deal. Thus, it appears that Prater was offered consideration for her role in the Lind investigation regardless of any action of Skogstrom, but she rejected it.
 {¶ 37} Prater's Second Assignment of Error is overruled.
 IV {¶ 38} Prater's Third Assignment of Error is as follows:
 {¶ 39} "APPELLANT WAS DENIED HER DUE PROCESS RIGHT TO A FAIR TRIAL."
 {¶ 40} Prater contends that the alleged misconduct of Lind and his contact in the prosecutor's office as well as Skogstrom's actions deprived her of a fair trial.
 {¶ 41} As noted by the State, Prater failed to raise any issue of prosecutorial misconduct in the trial court, thereby forfeiting this issue on appeal. Regardless of whether this issue was properly preserved, we note that the record is devoid of any evidence to indicate that the prosecutor in Prater's case was involved with Lind. To the contrary, Woodruff testified that his office did not find any evidence that the prosecutor was involved.
 {¶ 42} We do not see how Lind's alleged conduct served to deprive Prater of a fair trial. Furthermore, as noted above, we conclude that Skogstrom did not render ineffective assistance of counsel. In any event, Prater was represented by new counsel well before the time she would have been tried.
 {¶ 43} Finally, there is nothing in the record to indicate that Prater would not have *Page 15 
received a fair trial. To find a deprivation of her rights would require us to speculate as to the outcome of a trial that did not occur because Prater decided to enter a plea of no contest. Prater's Third Assignment of Error is overruled.
 V {¶ 44} All of Prater's assignments of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J., and DONOVAN, J., concur.
Copies mailed to:
Amy M. Smith
Andrea Ostrowski
Hon. Richard J. O'Neill
[1] Prater was married after the inception of this case, and is now known as Kimberly Napier. For clarity, we will continue to refer to her as Prater throughout this opinion, especially since her husband, Jesse Napier, figures prominently in this opinion. *Page 1